IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

BILLY JONES,

      Plaintiff,

vs.                                         No. 13-00741 RB-WPL

ESPANOLA MUNICIPAL SCHOOL
DISTRICT, JANETTE ARCHULETA and
MARTHA FERNANDEZ,

      Defendants.

## MOTION FOR SUMMARY JUDGMENT OF DEFENDANT MARTHA FERNANDEZ ON GROUNDS OF ABSOLUTE IMMUNITY OR, IN THE ALTERNATIVE, QUALIFIED IMMUNITY

COMES NOW Defendant, Martha Fernandez (Fernandez), by and through Hatcher & Tebo, P.A. and pursuant to Fed.R.Civ.P. 56, moves this Court for its order dismissing her from this lawsuit, with prejudice, on grounds of absolute immunity or, in the alternative, qualified immunity.  As grounds for this Motion, Defendant Fernandez shows as follows:

I.
## SUMMARY OF ARGUMENT

This case arises out of a series of events which occurred in Espanola, New Mexico, over a three day period, September 7-9, 2010.  According to the Complaint, Plaintiff was a minor student attending Espanola Valley High School (EVHS) when he was involved in a physical altercation with another student, designated "K.A.," on January 22, 2010.  Allegedly, Plaintiff, as a result of that incident, developed post-traumatic stress disorder (PTSD).

On September 7, 2010, Plaintiff was found to have written materials in his backpack at school which, according to the Complaint, "contained images of tombstones with students' names and other negative imagery."  (Amended Complaint, Doc. 5, at ¶ 34).  Plaintiff alleges this was

"art," "for a storyboard," and was "therapeutic and could help him cope with the stress of being bullied at school." (*Id.* at ¶ 35).  In fact, the writings contained lists of fellows students which included one titled:  "List for Hell," and drawings depicting disturbing scenes such as a "Shack of Blood," a beheading, the words "unleash hell," a torture room with two heads on a "head shelf" and a graveyard with tombstones naming certain fellow students with the words "to hell" on the bottom.   As a result of a review of these materials, Plaintiff was interviewed by school administrators and law enforcement at the Espanola Police Department (EPD) and later transported to St. Vincent's Treatment Center for psychiatric evaluation.  (*Id.* at ¶ 37).

Although Plaintiff alleges he was found not to be a danger to himself or others by hospital health care personnel and was therefore released from custody, school officials, on September 8, 2010, learned from the EPD investigating this matter that the Plaintiff was no longer at the hospital. Because officials at EVHS had information leading them to believe that Plaintiff was no longer at the hospital and would return to school to act out his drawings, the EPD believed there was probable cause to arrest Plaintiff and, further, that the arrest was necessary to protect the public.

Ms. Fernandez, a Juvenile Probation Officer (JPO) with the Children, Youth & Families Department (CYFD) assigned to Rio Arriba County, was contacted by EPD officers for purposes of authorizing Plaintiff's arrest and to conduct a follow up preliminary investigation.  Ms. Fernandez communicated with EPD officers regarding this case, learned of the charges of aggravated assault and attempted murder and, in accordance with CYFD protocol required through the Children's Code, specifically NMSA 1978, § 32A-2-1, *et seq* (2010 Repl.Pamp.), authorized the detention of Plaintiff.  The following morning, Ms. Fernandez, again as required by law, conducted a preliminary investigation with Plaintiff and certain family members, including his mother.  Virtually no useful information was learned in that process because the mother, on behalf

of Plaintiff, asserted "the Fifth" and refused to provide any answers to Ms. Fernandez's questions. Ms. Fernandez then prepared a preliminary investigation report to the Children's Court attorneys' office (CCA) (First Judicial District Attorney) recommending that delinquency proceedings ensue at the CCA's discretion.  It was later learned that the CCA determined there was insufficient evidence to prosecute Plaintiff for the crimes charged by the EPD, specifically aggravated assault and attempted murder.

Prior to the preliminary investigation, but after Ms. Fernandez approved the arrest and detainment of Plaintiff, he was arrested by EPD officers at the Presbyterian Center in Espanola where, apparently, Plaintiff was undergoing counseling.  He was placed in handcuffs and driven to the Espanola Detention Center.

Because Ms. Fernandez's role as a JPO in the process of evaluating and determining whether to recommend a petition of delinquency be filed against a juvenile by the CCA, she serves in a quasi-prosecutorial role.  As such, she is entitled to absolute or quasi-prosecutorial immunity because as she performs a prosecutorial function.

Alternatively, because Ms. Fernandez could reasonably believe she was acting lawfully in not only authorizing the detention of Plaintiff but in recommending a delinquency petition be filed by the CCA, she is entitled to qualified immunity.

II.
STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      On Tuesday, September 7, 2010, at approximately 2:00 PM, Espanola Police Lieutenant Christian Lopez responded to a call at EVHS and met with school resource officer, Danny Pacheco, Assistant Principal DeVanna Ortega, school psychologist Lloyd Vigil, school security officer Chris Archuleta, and a student identified as B.J. (Plaintiff) in this lawsuit. *See* Affidavit of Lt. Christian Lopez, attached hereto as Exhibit A; Affidavit of Danny Pacheco,

attached hereto as Exhibit B; Affidavit of DeVanna Ortega, attached hereto as Exhibit C; and  Affidavit of Lloyd Vigil, attached hereto as Exhibit D.

2.      The subject of the meeting was the discovery at school of disturbing materials in Plaintiff's backpack. (*Id.*)

3.      During the meeting, Plaintiff's mother identified as C.J. in this lawsuit, arrived at the school.  *See* Exhibits A & C.

4.      Lt.  Lopez was shown writings and drawings that were found in Plaintiff's backpack.  *See* Exhibits A, B, C, D.

5.      Plaintiff admitted to Lt. Lopez that he wrote and drew the documents. *See* Exhibits A, B, & C.

6.      Lt. Lopez observed three lists of names, one of which was titled "list for hell." Plaintiff stated that the names on the lists were names of other students in the school who "bugged him." The lists are attached hereto as Exhibit I to Lt. Lopez's affidavit. *See* Exhibit A, B, & C.

7.      The drawings that concerned Lt. Lopez depicted the following: a disturbing scene of  a "shack of blood," a beheading by a man wearing a t-shirt emblazoned with the words "unleash hell," a bloody scene in a room that appeared to be a chemistry lab, a torture room with two people in restraints (one with the name Angel on her t-shirt) and two heads on a "head shelf," and a graveyard with four headstones containing names of fellow students with the words  "to HELL" at the bottom. These drawings are attached hereto as Exhibit 2 to Lt. Lopez's affidavit. *See* Exhibit A.

8.      Plaintiff stated the pictures were of scenes from a movie he wanted to make. *See* Exhibit A.

9.     Plaintiff stated he used names of other students on the tombstones because they were students he would see on a daily basis who would "bug" him. *See* Exhibits A, B, & C.

10.    Lt. Lopez confirmed with Assistant Principal Ortega that some of the names on the lists, including the "list for hell," and on the tombstones were students at EVHS. *See* Exhibits A & C.

11.    The fellow students identified on the lists are Jolene Benson (whom Plaintiff referred to as Pink Whore on the tombstone picture and the List for Hell); Chris D., and Austin. *See* Exhibits A, B, & C.

12.    The fellow students identified on the tombstones were Jolene Benson, Austin C. and Chris D. Trujillo. *See* Exhibit A, B & C.

13.    Lt. Lopez asked Plaintiff if he was going to hurt or injure himself and he replied, "I don't think so" but that sometimes he didn't know what he was thinking in his head. *See* Exhibit A, B, C & D

14.    At this point, Plaintiff's mother C.J. intervened in the interview and stated that Plaintiff did have violent tendencies as he did express them two weeks prior, when she told him to take a bath and get ready for school the next day. C.J. stated Plaintiff had placed his hand around C.J.'s throat and then grabbed her arms. C.J. still had bruises on the upper part of her arm that were in the healing process, which Lt. Lopez observed. C.J. stated they were caused by Plaintiff. *See* Exhibits A, C & D.

15.    Lt. Lopez then asked Plaintiff if he thought he could hurt someone, or any of the fellow students on the list and Plaintiff stated that he did not know. *See* Exhibits A & C.

16.    Lt. Lopez again asked Plaintiff if he would hurt himself, such as kill himself, and Plaintiff stated, "I don't know, sometimes I think that's the only way out." *See* Exhibits A

& C.

17.     C.J., Plaintiff's mother, expressed concern for her safety not knowing if Plaintiff would attack her.  *See* Exhibits A & C.

18.     Lt. Lopez was informed by C.J. that she had contacted Plaintiff's father T.J., who lived in Georgia, about the unfolding situation, and T.J. was very aggressive and started yelling over the telephone. *See* Exhibit A.

19.     The school also had in its possession, and showed Lt. Lopez, a handwritten note from a student and an email from a teacher regarding Plaintiff.  *See* Exhibits A & C.

20.     The handwritten note was authored by a student named Samantha Madrid and stated that Plaintiff was threatening her and telling her he was going to kill her.  According to the note, Plaintiff told Samantha Madrid that she was on Plaintiff's "hit list" and that he was going to bring a knife or gun to school and kill her.  The student feared coming to school because of Plaintiff.  A copy of this handwritten note is attached to Lt. Lopez's affidavit as Exhibit 3. *See* Exhibits A, C.

21.     The email was sent to Gloria Champion from teacher Josefina Litera at 11:44 AM on September 7, 2010.   In it, Ms. Litera stated that a female student observed Plaintiff making a list and that her name was on the list.  In the email, Ms. Litera stated that the female student told Ms. Litera that she was afraid Plaintiff.  Ms. Litera also noticed that Plaintiff's hands were shaking.  A copy of this email is attached to Lt. Lopez's affidavit as Exhibit 4. *See* Exhibits A & C.

22.     Lt. Lopez was also informed by school psychologist Lloyd Vigil that at one point  when Dr. Vigil walked back into the room where Plaintiff and C.J. were, Dr. Vigil observed C.J. with her head in her son's lap, she was very distraught and Plaintiff was trying

to comfort his mother. C.J. also appeared very distressed at the thought that Plaintiff may be taken from her for psychiatric care and stated something to the effect that she "needs" Plaintiff with her.  Dr. Vigil was concerned enough about this regressive behavior of a mother towards a son that Dr. Vigil told Lt. Lopez of the mother's behavior and the fact that her behavior concerned Dr. Vigil.  *See* Exhibit D.

23.    Plaintiff was transported from the high school to St. Vincent's Hospital by ambulance for a psychiatric evaluation. *See* Exhibits A & C.

24.    The next day, on September 8, 2010, Lt. Lopez was informed by Espanola High School Assistant Principal, Reuben Salazar, that Salazar's daughter received phone calls from Plaintiff the night before asking that she come and pick him up from the hospital. *See* Exhibits A & C.

25.    Lt. Lopez also spoke to Mr. Salazar's daughter who confirmed that Plaintiff had called her from the hospital the night before asking for a ride home. She described Plaintiff as sounding "distant" on the telephone.  *See* Exhibit A.

26.    Assistant Principal Ortega also heard from fellow Assistant Principal Salazar that his daughter had received phone calls from Plaintiff the night before asking the daughter to come and pick him up from the hospital.  *See* Exhibit C.

27.    Assistant Principal Salazar told Assistant Principal Ortega that he was concerned for the safety of his daughter, a student at the high school.  Assistant Principal Ortega told school resource officer  Danny Pacheco of the fear that the staff and students had that Plaintiff was no longer at the hospital and would return to school to act out what he had written and drawn.  *See* Exhibit C.

28.    Lt. Lopez was contacted by the Assistant Superintendent, Dr. Trujillo, who told

Lt. Lopez that Assistant Principal Salazar had contacted him to express his fear, as well as the fear of others at the high school, that Plaintiff would come to the school and act out what he had written and drawn.  *See* Exhibit A.

29.     Based on the foregoing, Lt. Lopez believed he had probable cause to arrest Plaintiff.  He also believed Plaintiff's arrest was necessary to protect the public.  *See* Exhibit A.

30.     Pursuant to the Children's Code NMSA 1978, § 32A-1-1, *et seq,* the CYFD is tasked with providing juvenile probation and parole services which, in turn, obligates it to receive and examine complaints or allegations that a child is delinquent for purposes of considering, among other matters, authorization of the temporary detention of juveniles or determining whether a delinquency petition should be filed.  (See affidavit of Martha Fernandez, attached hereto as Exhibit E).

31.     In carrying out its statutory duties, the CYFD acts through a juvenile probation officer, in this case, Martha Fernandez.  Ms. Fernandez conducts a Detention Risk Assessment in order to determine whether or not to authorize, on behalf of CYFD, a temporary detention or recommend a petition for delinquency charges be filed at the Children's Court attorneys' discretion through the First Judicial District Attorneys' office.  (*Id.*)

32.     It is Ms. Fernandez' duty, once receiving a call from a law enforcement officer, to gather information and consult with CYFD's statewide central intake to determine how to proceed with respect to the best interests of the juvenile and the public.  Ms. Fernandez utilizes criteria set forth in NMSA 1978 § 32A-2-11 (2010 Repl. Pamp.). (*Id.*)

33.     The Detention Risk Assessment carried out by Ms. Fernandez determines whether the child (1) poses a substantial risk of harm to himself; (2) poses a substantial risk

of harm to others; or (3) has demonstrated that he may leave the jurisdiction of the Court. (*Id.*).

34.    Certain felonies, such as the charge of attempted murder, require detention under the risk assessment instrument.  Under those circumstances, CYFD is required to authorize detention once those charges are brought by law enforcement.  (*Id.*)

35.    Law enforcement is responsible for the methods and means of its investigation, determination of probable cause, and decision to arrest.  The job of CYFD, after authorizing detention, is to conduct a preliminary inquiry pursuant to procedures established in NMSA 1978 § 32-A-2-7.  This procedure allows the CYFD to gather information, including, conducting an interview of the juvenile and his or her family, and ultimately make recommendations to the Children's Court attorney whether or not to proceed with delinquency proceedings.  (*Id.*)

36.    With respect to Billy Jones, Ms. Fernandez was informed by the EPD that a statement of probable cause had been issued charging Billy Jones with two offenses, one each for "attempt to commit a felony" to wit: murder, and another for "aggravated assault."  (*Id.*)

37.    After undertaking the Detention Risk Assessment, Mr. Fernandez determined that Mr. Jones met the criteria for secured detention at which time she contacted the EPD with the response that he was to be retained.  (*Id.*)

38.    Ms. Fernandez conducted the preliminary inquiry on September 10, 2010, which was attended by the child, telephonically, his mother and other family members.  All informed Ms. Fernandez that they wanted to "plead the Fifth," and, as a result, virtually no useful information was gathered.  As a result, Ms. Fernandez generated a preliminary inquiry determination in which she determined that it was in the best interests of the child and the

public that a delinquency petition be filed by the Children's Court attorney because the case involved a felony.  Ms. Fernandez further recommended that the "child remain in detention as he allegedly was a danger to himself, a danger to the community, and a possible flight risk." This determination was made on the basis of all information provided to her by EPD and the response from statewide central intake regarding the criteria for detention.  (*Id.*)

39.     On September 8, 2010, Lt. Lopez prepared the Criminal Complaint and Statement of Probable Cause attached to his affidavit as Exhibit 5.  *See* Exhibit A.

40.     After receiving approval from JPO Fernandez to arrest Plaintiff, Lt. Lopez asked Espanola Police Officer, Richard Gallegos, to make contact with the Ohkay Owingeh Police Department and ask permission to go to Plaintiff's residence in Ohkay Owingeh Pueblo to arrest Plaintiff.  *See* Exhibit A and Affidavit of Richard Gallegos attached hereto as Exhibit F.

41.     Sergeant Richard Gallegos made contact with the Ohkay Owingeh Police Department and asked permission to go to Plaintiff's residence in Ohkay Owingeh Pueblo to arrest Plaintiff.  *See* Exhibit F.

42.     The Ohkay Owingeh Tribal Court Judge gave Sgt. Gallegos permission to arrest Plaintiff. A copy of the authorization is attached to Sgt. Gallegos' affidavit as Exhibit 1. *See* Exhibit F.

43.     Sgt. Gallegos was accompanied by a tribal police escort and went to Plaintiff's home.  No one answered the door. *See* Exhibit F.

44.     Plaintiff and his mother heard the knocking but hid in the house because they thought it was the police.  *See* Transcript of Plaintiff interview, attached hereto as Exhibit G.

45.     On September 9, 2010, Plaintiff had still not been located when Lt. Lopez arrived at EVHS.  A fire alarm went off and the fire department was called.  *See* Exhibits A, C.

46.     When Lt. Lopez arrived at the high school, Lt. Lopez was informed that an anonymous caller had called the High School switchboard and stated that there was a student on campus with a black handgun in his backpack.  *See* Exhibits A & C.

47.     Lt. Lopez began searching the high school when Lt. Lopez was notified by Sgt. Gallegos that he had information as to Plaintiff's whereabouts.  Lt. Lopez instructed Sgt. Gallegos to arrest Plaintiff.  *See* Exhibits A & F.

48.     Sgt. Gallegos went to Presbyterian Center and was informed by the receptionist that Plaintiff was not there.  Sgt. Gallegos asked the receptionist to call dispatch if Plaintiff did arrive.  *See* Exhibit F.

49.     A short time later, Sgt. Gallegos received a call from dispatch that the Center had called to inform them that Plaintiff was at the Center.  *See* Exhibit F.

50.     When Sgt. Gallegos arrived at the Center, Plaintiff was in a side room that looked like a waiting room. *See* Exhibit F.

51.     Sgt. Gallegos explained to Plaintiff what he was doing and placed him in handcuffs only (not leg shackles).  *See* Exhibit F.

44.     At no time did Plaintiff complain that the handcuffs were hurting him.  *See* Exhibit F.

45.     Sgt. Gallegos drove Plaintiff to the Espanola Detention Center.  *See* Exhibit F.

46.     Sgt. Gallegos filled out a booking authority form on September 9, 2010, a copy of which is attached to Sgt. Gallegos' affidavit as Exhibit 2.  *See* Exhibit F.

47.     Sgt. Gallegos relied upon Christian Lopez's statement of probable cause and the criminal complaint in arresting Plaintiff, a copy of which is attached to Sgt. Gallegos' Affidavit as Exhibit 3.  *See* Exhibit F.

III.

LEGAL ARGUMENT

A.      Summary Judgment Standards.

In ruling on motions for summary judgment, the burden of demonstrating that no genuine issue of material fact exists lies with the movant.  "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2510, (1986).   All inferences from the underlying facts must be viewed in a light favorable to the party opposing the motion although the non-moving party "must do more than show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 186 S.Ct. 1348, 1356, (1986).  Conclusory allegations or those based on speculation by the non-moving party will not suffice to create a genuine issue. *Delaware & Hudson Railway Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2nd Cir. 1990).  A genuine issue of material fact is one which could turn the outcome in favor of the non-moving party based on the evidence by a trier of fact. *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510.

B.      Defendant Fernandez is entitled to Absolute or Quasi-Prosecutorial Immunity.

Defendant Fernandez is entitled to absolute or prosecutorial immunity.  The Tenth Circuit recognizes the defense of absolute immunity in cases brought under 42 U.S.C. § 1983 in which the defendant acted in a prosecutorial role.  For example, a prosecutor is absolutely immune for actions taken in the investigation of charges to determine whether to bring a criminal prosecution. *See Imbler v. Pachtman*, 424 U.S. 409, 430, 96 S.Ct. 1984, 994-95 (1976).  The concept of absolute or prosecutorial immunity has also been extended to public employees who are not prosecutors, but who perform a particular function considered "prosecutorial" and which is integral to the

criminal judicial process. *Kalina v. Fletcher,* 522 U.S. 118, 127, 118 S.Ct. 502 (1997). This immunity involves "acts undertaken . . . in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of [her] role as an advocate for the state." *Buckley v. Fitzsimons,* 509 U.S. 259, 273, 113 S.Ct. 2606 (1993).

There is a sound basis for absolute immunity in favor of those whose activities involve a prosecutorial function. Specifically, without such immunity "it is inevitable that many of those who lose [cases in the system], will pin the blame on judges, prosecutors, or witnesses and will bring suit against them in an effort to relitigate the underlying conflict. *Mitchell v. Forsythe,* 472 U.S. 511, 521-22, 105 S.Ct. 2806 (1995). Without absolute immunity for these individuals, potential for "harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties and [create] the possibility that he would shade his decisions instead of exercising the independent of judgment required by his public trust." *Imbler* at 424 U.S. 423.

The immunity provided to those exercising the prosecutorial function immunizes against claims of the failure to conduct an adequate, independent investigation. *Scott v. Hern,* 216 F.3d 897, 909 (10th Cir. 2000). In other words, this form of absolute immunity protects against suit those who fall within its scope from claims that they failed to conduct a proper investigation or acted negligently with respect to matters referred to them for prosecution. *See Pfeiffer v. Hartford Fire Ins. Co.*, 929 F.2d 1484, 1490 (10th Cir. 1991). *See also, Imbler,* 424 U.S. at 430-31 (applying absolute immunity to a prosecutor's alleged unconstitutional suppression of material evidence); *B.T. v. Santa Fe Public Schools*, 506 F.Supp.2d 718, 729 (D.N.M. 2007) ("The Tenth Circuit has repeatedly held that prosecutors are absolutely immune for failing to conduct adequate, independent investigations.").

The Tenth Circuit recognizes absolute immunity for social workers working in the context of child dependency or delinquency proceedings, although the analysis looks to the specific functions of that worker in the context of the case at hand, as opposed to any broad grant of immunity based on titles or job duties.  In *Snell v. Tunnell,* 920 F.2d 673, 688-89 (10th Cir. 1990), the Court noted "an important prerequisite of absolute immunity in this context is that the defendant social worker 'act as an actual functionary of the court, not only in status or denomination, but in reality'."  *Id.*, *citing Gardner,* 874 F.2d 131, 146 (3rd Cir. 1989).

Ms. Fernandez operates, with respect to juvenile delinquency proceedings, in a quasi-prosecutorial function.  Under the Children's Code, the JPO, following receipt of charges alleging delinquency or, in this case, charges against Plaintiff of aggravated assault and attempted murder, conducts a preliminary inquiry "to determine the best interests of the child and the public with regard to any action to be taken."  NMSA 1978, § 32A-2-7A.  After review of the charges from law enforcement, and completion of the preliminary inquiry on a delinquency charge, the JPO "recommend[s] a disposition to the Children's Court attorney."  § 32A-2-7F.  A petition alleging delinquency "shall not be filed . . . unless the Children's Court attorney, after consulting with probation services, has determined and endorsed upon the petition that the filing of the petition is in the best interests of the public and the child."  § 32A-2-8.  The best interests' determination, whether by the JPO or CCA, involves the exercise of discretion.  *See State v. Doe,* 97 N.M. 792, 643 P.2d 1244 (Ct.App. 1982).  The preliminary inquiry and recommendation of whether to file a delinquency petition is integral to the judicial process of bringing delinquency proceedings against a minor.  Although the final determination whether legally sufficient grounds to proceed to court

with a petition lies with the CCA, the initiating action is the preliminary inquiry, with the JPO's recommendations. *See* Rule 10-211A, with Committee Commentary.[1]

It is mandatory that prior to the filing of a petition, the JPO must make her recommendation as to whether or not a delinquency petition should be filed. The CCA must consult with the JPO in the determination of whether or not to prosecute the criminal charge. The preliminary inquiry and recommendations from the JPO represent the first stage in the process toward bringing about criminal proceedings. As such, the job of the JPO carries with it prosecutorial function and Defendant Fernandez is entitled to absolute immunity.

The Court, in *Santa Fe Public Schools* considered similar issues with respect to § 1983 claims made against the director of the New Mexico Public Education Department's public licensure unit and an in house attorney-investigator after they were sued for the violation of federally protected civil rights after failing to initiate procedures to revoke a teacher's license of a known child abuser. After investigating the teacher in question, these public employees determined not to initiate proceedings to revoke the perpetrator's teaching license based on circumstances of sexually abusive behavior by the teacher at a school district prior to his employment with the Santa Fe Public Schools. After a student was sexually abused by the teacher in Santa Fe, suit followed. The NMPED employees sought summary judgment on grounds they were entitled to absolute immunity asserting that they were involved in a prosecutorial function in the investigation and determination whether to revoke the license of the teacher before he became

---

[1] Committee Commentary to Rule 10-211 NMRA states: "Under Paragraph A of Rule 10-211 NMRA, the filing of a petition is a two-step process: (1) probation services conducts a preliminary inquiry and either recommends or refuses to recommend the filing of a petition; and (2) the Children's Court attorney reviews the matter to determine if there are legally sufficient grounds to proceed to Court with the case. The Children's Court attorney makes the final determination whether or not to prosecute the child. The Children's Court attorney may do so even if probation services has not recommended a petition and may refuse to do so even if probation services has recommended the filing of the petition. However, probation services must have completed a preliminary inquiry before the petition can be filed.

employed with the Santa Fe Public Schools.  The Court here granted defendants' motion to dismiss the claims on grounds of prosecutorial, absolute immunity, even though plaintiff alleged the allegations against the defendants were the failure to conduct an adequate independent investigation of the teacher.  The Court ruled that the investigation reflected the prosecutorial function and absolute immunity applied to all acts or omissions of the NMPED including its investigation to determine whether or not license termination proceedings were to proceed.  *Id.* at 506 F.Supp.2d 728-29.  The claims against Defendant Fernandez are no different in principle. Plaintiff claims she failed, in making her decision to authorize determination and refer for prosecution in this case, to respect his protected rights, including the failure to investigate whether or not Plaintiff had been released from the St. Vincent Hospital psychiatric unit.  Ms. Fernandez is nonetheless entitled to pursue her investigation and decision making free from fear of litigation based on allegations of wrongdoing with the luxury of "20/20 hindsight."  Invoking absolute immunity on behalf of Defendant Fernandez serves the purpose of ensuring "the vigorous and fearless performance of the prosecutor's duty that is essential to the proper functioning of the criminal justice system."  *Imbler* at 424 U.S. 427-28.  The Court should rule Defendant Fernandez is entitled to absolute immunity and dismiss her from this lawsuit, with prejudice.

   C.  <u>Alternatively, Defendant Fernandez is Shielded by Qualified Immunity.</u>

   The standards for applying qualified immunity in claims against public officials for the violations of constitutional rights is well established.  Government officials are entitled to qualified immunity where their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. FitzGerald,* 457 U.S. 800, 818, 102 S.Ct. 2727 (1982).  Qualified immunity balances two important interests.  On the one hand, it recognizes the need to hold government officials accountable when they exercise power

irresponsibly and, on the other hand, shielding these officials from "harassment, distraction and liability when they perform their duties reasonably. *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808 (2009).  "The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions."  In determining whether ones actions are reasonable for qualified immunity purposes, the Court looks objectively to whether any "mistake as to what the law requires is reasonable." *Saucier v. Katz,* 533 U.S. 194, 205, 121 S.Ct. 2151 (2001).  The Court, in *Saucier* stated:  "Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause."  (*Id.*)

Traditionally, Courts follow a two-step approach for resolving qualified immunity claims. First, a Court must decide whether the facts that a plaintiff alleges makes out a violation of a constitutional right.  If so, the Court must then decide whether the right at issue was "clearly established" at the time of the Defendant's alleged misconduct.  *Id.* 533 U.S. at 201.  The Court in *Pearson*, however, recently determined that the two step protocol may be disregarded, allowing the Court to first determine whether there was a violation of clearly established law before considering any violation of a constitutional right.  *Pearson* at 555 U.S. 239, 129 S.Ct. 808.  This approach has the obvious benefits of expediency.

In reviewing the unlawful conduct alleged against Fernandez, there appear to be at least three primary claims.  Initially, Plaintiff claims that because Fernandez failed to "verify whether Billy Jones was a fugitive at large, or a mentally disabled teenage boy who had been released from the hospital," Fernandez authorized the arrest of Plaintiff, who was charged with attempted murder, "all in violation of the Americans with Disabilities Act and in violation of his First, Fourth and Fourteenth Amendment rights."  Plaintiff goes on to allege the arrest was "objectively

unreasonable as he had committed no crime in drawing pictures to reduce the stress of being bullied at school." (Doc. 5 at ¶ 53).  Although Fernandez has no law enforcement duties nor is she tasked with determining probable cause to arrest, Plaintiff nonetheless alleges she "lacked probable cause to arrest for attempted murder and, therefore, criminalized his disability by facilitating his arrest and the groundless charge of attempted murder."  *Id.* at ¶ 55.  The remaining count against Defendant Fernandez is a violation of the equal protection clause of the Fourteenth Amendment in that she allegedly "treated Billy Jones differently and denied him his right to equal protection of the law based on his disability."  *Id.* at ¶ 70.  The question before this Court on the issue of qualified immunity is whether, in authorizing the detention of Billy Jones and proceeding with her statutory duties as a JPO in this case, there was clearly established law in the Tenth Circuit informing Fernandez that her conduct was unlawful.  In evaluating this issue in the context of the Fourth Amendment claims, Plaintiff must establish more than simply the generalized principle that warrantless arrests without probable cause was unconstitutional as clearly established at the time of the material events.  Rather, the inquiry is whether a reasonable official would understand that her actions, given her authority and the facts known to her, violated constitutional rights.  *Herring v. Keenan,* 218 F.3d 1171, 1176 (10th Cir. 2000).  In other words, the qualified immunity inquiry "must be undertaken in light of the specific context of the case, not as a broad, general proposition."  *Saucier*, 533 U.S. at 201.

The Supreme Court recently punctuated the extreme burden on plaintiffs in establishing § 1983 claims against individual government officials.  In *Ashcroft v. Al-Kidd,* 131 S.Ct. 2074 (2011), the Court emphasized there must be clear, indisputable case law which places "the statutory or constitutional question beyond debate" in order to meet the "clearly established" standard.  *Id.* at 131 S.Ct. 2083.  Qualified immunity "gives government officials breathing room

to make reasonable but mistaken judgments about open legal questions.  When properly applied, it protects "all but the plainly incompetent or those who knowingly violate the law."  *Id.* at 131 S.Ct. 2085, *quoting Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092 (1986).

In this case, there is no clearly established law which required Defendant Fernandez to "verify Plaintiff was a fugitive" or to determine the opinions of the St. Vincent Hospital psychiatrist who examined Jones, before authorizing the EPD to detain him.  There is no clearly established law requiring a JPO, where informed by the EPD on September 8, 2010, of the circumstances of the case, the statement of probable cause, and the charges of "attempted murder" and "aggravated assault," to conduct any further investigation prior to authorizing Jones' detention.  The work of a JPO in authorizing detention or in referring a case for delinquency proceedings with the Children's Court attorney, is distinct from law enforcement.  In fact, NMSA 1978, § 32A-2-5C specifically states: "A juvenile probation and parole officer does not have the powers of a law enforcement officer."   Among other things, Ms. Fernandez's duties were to "receive and examine complaints and allegations . . . for the purpose of considering beginning a proceeding pursuant to the provisions of the Delinquency Act."  *Id.* at § 32A-2-5B(1).  There is no clearly established law informing Ms. Fernandez that the failure to verify Plaintiff was "mentally disabled" or that he was released from a psychiatrist's treatment, would deprive him of a constitutional right.  For these reasons alone, Defendant Fernandez is entitled to qualified immunity.

Even if the Court were to read a duty on Fernandez to establish probable cause to arrest, which she doesn't have because she has no law enforcement power, she is still entitled to qualified immunity.  An arresting officer is entitled to qualified immunity for a warrantless arrest "if a reasonable officer could have believed that probable cause existed to make the arrest."  *Koch v.*

*City of Dell City,* 660 F.3d 1228, 1241 (10th Cir. 2011).  This so-called "arguable probable cause" standard is met "even [where] law enforcement officials . . . reasonably but mistakenly conclude that probable cause is present . . .".  *Koch,* 660 F.3d at 1241.  An officer need not be accurate or correct in the probable cause determination and "it does not even require the suspect's guilt to be 'more likely true than false'." *Kearns v. Bader*, 663 F.2d 1173, 1188 (10th Cir. 2011).  Finally, probable cause is measured from the information existing at the time the arrest is made. *Durruthy v. Pastor,* 351 F.3d 1080 (11th 2003).  The probable cause statement makes clear, not only to law enforcement officers, but certainly Ms. Fernandez, that probable cause to arrest or detain Plaintiff existed.  It was reasonable for either law enforcement or Ms. Fernandez to have probable cause to believe that the depictions of murders, together with a "list for hell" and pictures of tombstones with fellow students names on both the list and the tombstones, along with the other circumstances set forth in the statement of probable cause, might result in Plaintiff carrying out a horrible crime.  It was reasonable for Ms. Fernandez to believe that it was in the best interests of not only Plaintiff but certain fellow students and administrators that a detention be carried out by law enforcement.

Other cases in which similar claims were brought under strikingly similar fact patterns support a determination of probable cause to arrest and detain.  In *Ryburn v. Huff,* 132 S.Ct. 987 (2012) the Supreme Court affirmed a qualified immunity in favor of arresting officers where they could reasonably have believed that a high school student, rumored to have written a letter to shoot up a school, was found at his home with his mother refusing to answer the police knock or otherwise cooperating in questioning.  The Court emphasized the exigent nature of the circumstances noting that "within a very short period of time, the officers were confronted with facts and circumstances giving rise to grave concern about the nature of the danger they were confronting." *Id.* at 132 S.Ct. 988, 989.  In granting qualified immunity in a § 1983 Fourth

Amendment claim, the Court admonished against second guessing law enforcement assessments under circumstances where the fear of violence was imminent.  *Id.* at 132 S.Ct. 991-992.

A similar situation was evaluated in the context of a § 1983 Fourth Amendment claim against a New York state police trooper in *Strawn v. Holohan,* 2008 W.L. 65586 (N.D.N.Y. 2008). There, police placed a student under attest upon a finding of probable cause after they learned of a written entry in a notebook entitled "school shootings" in which the "perfect plan" was described. This involved the students at plaintiff's high school being "tricked into evacuating the school due to a bomb threat only to be killed when a bomb explodes in the field in which the evacuated students are standing."  *Id.* at *1.  The Court found there was probable cause for a warrantless arrest.  Likewise, in *D.F. v. Board of Education of Syosset Central School District,* 386 F.Supp.2d 119 (E.D.N.Y. 2005), a twelve year old wrote in a journal a story about going on a killing spree where characters in the story were named after actual students with whom the plaintiff went to school.  There, the school subjected the boy to psychological testing without parental consent resulting in a § 1983 claim for the Fourth Amendment violation for unreasonable search and seizures.  The Court found no violation of the Fourth Amendment because "it was reasonable to believe that [plaintiff] was capable of violent acts toward his fellow students."  *Id.*  The Court found the school administration had "reasonable grounds for fearing that plaintiff might carry out the acts he described."  *Id.* at 386 F.Supp.2d 128.

Certainly, in the post-Columbine environment, law enforcement, school administrators and social workers find themselves in, it would indeed be irresponsible for any of the Defendants, and most specifically Ms. Fernandez, not to at least detain suspects if not refer matters to the Children's Court attorneys for further investigation and/or prosecution.

In *Riehm v. Engelking*, 538 F.3d 952 (8th Cir. 2008), the Court concerned itself with § 1983 claims against, among others, social workers for preparing petitions for the arrest and emergency protective care of a juvenile who claimed violations of his First, Fourth and Fourteenth Amendment rights, after the student submitted an essay in class detailing a murder suicide inspired by the Columbine shooting.  Under facts materially similar to those in the present case, and in discussion of the qualified immunity of the Defendant social workers, the Eighth Circuit, apparently under the old *Saucier* two step approach, ruled that there were no First or Fourth Amendment violations as a matter of law.  Noting that the First Amendment does not protect a true threat, "a statement that a reasonable recipient would have interpreted as a serious expression of an intent to harm or cause injury to another" is simply not protected.  *Id.* at 538 F.2d 963, *citing Doe v. Pulaski County Special School District,* 306 F.3d 616, 624 (8th Cir. 2002).  See also, *Ward v. Utah*, 398 F.3d 1239 (10th Cir. 2005).  Moreover, the Court noted the juvenile's speech occurred in the school environment, a place where "schools may regulate some speech even though the government could not censor similar speech outside the school."  *Id. citing Morse v. Frederick*, 551 U.S. 393, 127 S.Ct. 2618, 2627 (2007)  Finding the student's essay constituting a true threat, not protected under the First Amendment, the social worker defendants were found not to have violated any First Amendment rights.  It is noteworthy the Court's comment:  "In light of the gravity of the potential consequences of inaction in the face of evidence suggesting a potential [school] attack, we expected social workers to take reasonable action."  *Id.* at 967, *citing Pulaski*, 306 F.3d at 626.

Similarly, the Fourth Amendment claim in *Riehm* was dismissed.  Although the social worker in *Riehm* relied on an *ex parte* order for purposes of authorizing a detention, there is no principled difference between that case and Ms. Fernandez's reliance on law enforcement charges

based on a statement of probable cause.  The plaintiff in *Riehm* alleged the social worker omitted certain material facts from the petition for detention which was filed.  In *Riehm* the social worker filed a petition upon which a judge issued its *ex parte* order authorizing the juvenile's detention. The Court emphasized that a viable Fourth Amendment claim requires a showing of "deliberate falsehoods" or "reckless disregard for the truth."  *Id.* at 966 *citing Franks v. Delaware,* 438 U.S. 154, 171, 98 S.Ct. 2674 (1978).  Further, any omissions in the affidavit the social worker signed in support of an arrest order, as was claimed, must be shown to be the result of "intent to mislead" or with "reckless disregard for the truth." (*Id.*)  Here, although Plaintiff does not necessarily assert the statement of probable cause contained material omissions of fact, the claim against Defendant Fernandez is that she failed to verify whether the Plaintiff was a fugitive.  The same standard should apply to Ms. Fernandez as discussed in the *Riehm* case.  See *U.S. v Sanchez*, 735 F.3d 1243 (10th Cir. 2013).  Unless there is a showing she committed a "deliberate falsehood" or acted with "reckless disregard for the truth," there is no basis for a Fourth Amendment violation.

III.

CONCLUSION

There is no evidence Ms. Fernandez, in carrying out her statutory and other legal duties in light of the Espanola Police Department's determination of probable cause and charges of aggravated assault and attempted murder, did anything wrong or acted inappropriately in authorizing Plaintiff's detention.  At a minimum, there is no clearly established law of which she should have known that she was violating constitutional or other rights of the Plaintiff when authorizing his detention and in referring the matter for proceedings to the Children's Court attorney.  Defendant, Fernandez, is entitled to summary judgment on grounds of both absolute and qualified immunity, dismissing her, with prejudice and for costs of suit and other relief as is just.

HATCHER & TEBO, P.A.

*/s/ Scott P. Hatcher*

By:_____

Scott P. Hatcher, Esq.
150 Washington Ave., Suite 204
Santa Fe, NM   87501
(505) 983-6525
*Attorney for Defendants*

## CERTIFICATE OF MAILING

The undersigned hereby certifies he transmitted a true and accurate copy of the foregoing via CM/ECF to:

Joseph Kennedy, Esq.
Shannon Kennedy
1000 Second Street, N.W.
Albuquerque, NM  87102

Shannon L. Kennedy, Esq.
Kennedy & Oliver, P.C.
1000 Second Street, N.W.
Albuquerque, NM   87102

Bryan C. Garcia, Esq.
Carlos Sedillo, Esq.
Narvaez Law Firm, P.A.
P. O. Box 25967
Albuquerque, NM   87125

on this 12th day of March, 2014.

_____*/s/ Scott P. Hatcher*_____
Scott P. Hatcher, Esq.