# AFFIDAVIT OF DANNY PACHECO

STATE OF NEW MEXICO )
)ss.
COUNTY OF RIO ARRIBA )

I, Danny Pacheco, being duly sworn, states as follows:

1. In September 2010, I was employed by the Espanola Police Department and was the student resource office at Espanola High School.

2. On Tuesday, September 7, 2010, at approximately 2:00 PM, I met with Assistant Principal Devonna Ortega, Espanola police officer Christian Lopez, school psychologist Lloyd Vigil, school security officer Chris Archuleta, and a student identified as B.J. in this lawsuit.

3. During the meeting, B.J.'s backpack was searched and writings and drawings were found in B.J.'s backpack.

4. I heard B.J. admit that he wrote and drew the documents.

5. I heard B.J. state that the names on the lists, including one entitled "list for hell," were names of other students in the school who "bugged him."

6. I heard B.J. stated he used names of other students on the tombstones because they were students he would see on a daily basis who would "bug" him.

7. Some of the names on the "list for hell" and on the tombstones were students at Espanola High School.

8. The names on the lists that I recognized as fellow students are Jolene Benson, Chris D., and Austin.



9. The names on the tombstones that I recognized as fellow students were Jolene Benson, Austin C. and Chris D. Trujillo.

10. I heard Christian Lopez ask B.J. if he was going to hurt or injure himself and I heard B.J. reply "I don't think so" but that sometimes he didn't know what he was thinking in his head.

11. On September 9, 2010, a fire alarm was pulled at the Espanola Valley High School due to smoke on the roof of the science rooms at the school.

12. Not long after the fire alarm was pulled, I was informed by ~~Alexandra Rosas~~ [someone at Pro Sec ∞] that an anonymous caller had called the High School switchboard and stated that there was a student on campus with a black handgun in his backpack.

_____
Danny Pacheco

Subscribed and Sworn to before me this 7 day of November, 2012, by Danny Pacheco.

_____
Michele M. Catanach

[OFFICIAL SEAL
MICHELE M. CATANACH
Notary Public
State of New Mexico
My Comm. Expires 10-19-13]

My commission expires:

10-19-13                                            Notary Public

## AFFIDAVIT OF DEVANNA ORTEGA

STATE OF NEW MEXICO )
)ss.
COUNTY OF RIO ARRIBA )

I, DeVanna Ortega, being duly sworn, states as follows:

1. In September 2010, I was an Assistant Principal at Espanola Valley High School.
2. On Tuesday, September 7, 2010, at approximately 2:00 PM, I met with school resource officer Danny Pacheco, Espanola police officer Christian Lopez, school psychologist Lloyd Vigil, a school security officer, and a student identified as B.J. in this lawsuit.
3. During the meeting, B.J.'s mother identified as C.J. in this lawsuit arrived at the school.
4. During the meeting, I searched B.J.'s backpack and found writings and drawings a portion of which are attached to Christian Lopez's affidavit as Exhibits 1 & 2.
5. Lt. Lopez questioned B.J. about the writings and drawings.
6. I heard B.J. admit that he wrote and drew the documents.
7. I heard B.J. state that the names on a list entitled "list for hell" were names of other students in the school who "bugged him."
8. B.J. stated he used names of other students on the tombstones because they were students he would see on a daily basis who would "bug" him.
9. Some of the names on the "list for hell" and on the tombstones were students at Espanola Valley High School.
10. The fellow students identified on the list are Chris D., and Austin.
11. The fellow students identified on the tombstones were Jolene Benson, Austin C. and Chris D. Trujillo.
12. I heard Christian Lopez ask B.J. if he was going to hurt or injure himself and I heard B.J. reply "I don't think so" but that sometimes he didn't know what he was thinking in his head.
13. At this point, I heard B.J.'s mother C.J. state that B.J. did have violent tendencies as he did express them two weeks prior, when she told him to take a bath and get ready for school the next day.

EXHIBIT

14. I heard C.J. state B.J. had placed his hand around C.J.'s throat and then grabbed her arms.

15. C.J. showed us bruises on the upper part of her arm and stated they were caused by Billy.

16. I heard Lt. Lopez ask B.J. if he thought he could hurt someone, or any of the fellow students on the list, and I heard B.J. state that he did not know.

17. I heard Lt. Lopez ask B.J. if he would hurt himself such as kill himself, and I heard B.J. state "I don't know sometimes; I think that's the only way out."

18. I heard C.J. express concern for her safety not knowing if B.J. would attack her.

19. Before Lt. Lopez left the school, I gave him a copy of a note that was brought to my attention in the Spring of 2010 written by a fellow student. A copy of the note is attached to Christian Lopez's affidavit as Exhibit 3.

20. I also gave Lt. Lopez a copy of an email from teacher Josefina Litera to school counselor Gloria Champion. I do not recall if it was Ms. Litera or Ms. Champion that gave me the email, a copy of which is attached to Lt. Lopez's affidavit as Exhibit 4.

21. It was after I received the email that I asked B.J. be brought to my office the afternoon of September 7, 2010.

22. B.J. was taken from the high school to St. Vincent's Hospital by ambulance for psychiatric evaluation.

23. On September 8, 2010, I was informed by Assistant Principal Reuben Salazar's daughter received phone calls from B.J. the night before asking that she come and pick him up from the hospital.

24. I knew from previous conversations with fellow Assistant Principal Reuben Salazar that his daughter was dating B.J.

25. Assistant Principal Salazar told me he was concerned that B.J. was trying to be released from St. Vincent's without authority. He told me that he was also concerned for the safety of his daughter, a student at the high school.

26. I became concerned that B.J. was attempting to leave the hospital without permission since I knew that a minor could not be released into the care of another minor.

27. I asked the school psychologist to find out if B.J. was still in the custody of the hospital.

28. At some point, I was told that B.J. was no longer in the custody of the hospital, I believe from the school psychologist.

29. I told the school resource officer that the staff and students were fearful of B.J. returning to the school to act out what he depicted in his writings and drawings.

30. On the morning of September 9, 2012, a fire alarm was pulled at the high school. At the time we did not know why the alarm was pulled. Later we learned it was due to smoke on the roof of the science rooms at the school

31. Also on the morning of September 9, 2012, the school secretary told me that an anonymous call had come in that there was a person on the campus with a gun.

32. I do not remember the sequence of the two events (the fire alarm sounding and being informed of the phone call) but I do recall Lt. Lopez came to the high school, and I informed him of the anonymous phone call.

33. I again told Lt. Lopez that that the staff and students were fearful of B.J. returning to the school to act out what he depicted in his writings and drawings.

_DeVanna Ortega_
DeVanna Ortega

Subscribed and Sworn to before me this 7th day of November, 2012, by DeVanna Ortega.

My commission expires:

OFFICIAL SEAL
MICHELE M. CATANACH
Notary Public
State of New Mexico
My Comm. Expires 10-19-13

_Michele M Catanach_
Notary Public

## AFFIDAVIT OF LLOYD VIGIL

STATE OF NEW MEXICO         )
                            )ss.
COUNTY OF RIO ARRIBA        )

I, Lloyd Vigil, being duly sworn, states as follows:

1. In September 2010, I was employed by Espanola Public Schools as a school psychologist

2. I recall being called into the office of then Espanola High School Assistant Principal Devanna Ortega on or about Tuesday, September 7, 2010, sometime in the afternoon.

3. I recall the following persons attending a meeting in Ms. Ortega's office that afternoon: the student referred to as B.J. in this lawsuit; B.J.'s mother referred to as C.J. in this lawsuit, an officer of the Espanola Police Department, and at least one school security officers.

4. I recall hearing the Espanola Police Officer ask B.J. if he was going to hurt or injure himself, and I recall hearing B.J. reply "I don't think so" but that sometimes he didn't know what he was thinking in his head.

5. I recall hearing B.J.'s mother C.J. state that B.J. had been violent towards here recently, and I recall C.J. showing us bruises that she attributed to B.J. grabbing her arm.

6. At one point during the meeting, I stepped out of the room to speak to the Espanola Police Officer. When I went back into the room, I observed C.J. with her head resting in B.J.'s lap and being comforted by B.J.

7. I also recall that C.J. expressed that she was very distraught at the thought that B.J. may be taken from her for psychiatric care stated something to the effect that she "needs" B.J. with her.

8. I recall telling the Espanola Police Officer that C.J. had her head in B.J.'s lap and that C.J. was distraught about B.J. possibly being "taken" from her.



9. I recall hearing the Espanola Police Officer ask B.J. if he thought he could hurt someone, or any of the fellow students, and I recall hearing B.J. state that he did not know.

10. I recall hearing the Espanola Police Officer ask B.J. if he would hurt himself such as kill himself, and I recall hearing B.J. state "I don't know sometimes I think that's the only way out."

_____
Lloyd Vigil

Subscribed and Sworn to before me this 8th day of November, 2012, by Lloyd Vigil.

My commission expires:

_____
Notary Public

OFFICIAL SEAL
MICHELE M. CATANACH
Notary Public
State of New Mexico
My Comm. Expires 10-19-13

RECEIVED
MAR 06 2014

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

BILLY JONES,

    Plaintiff,

vs.                                                      No. 13-00741 RB-WPL

ESPANOLA MUNICIPAL SCHOOL
DISTRICT, JANETTE ARCHULETA and
MARTHA FERNANDEZ,

    Defendants.

## AFFIDAVIT OF MARTHA FERNANDEZ

I, Martha Fernandez, having first been duly sworn and upon oath depose and state as follows:

1.     I am a Juvenile Probation Office with the State of New Mexico Children, Youth & Families Department (CYFD) assigned to Rio Arriba County. I work out of CYFD's Espanola, New Mexico office.

2.     Pursuant to statutory authority under the Children's Code, NMSA 1978, § 32A-1-1, *et seq.* (2010 Repl.Pamp.), the CYFD is tasked with, among other things, providing juvenile probation and parole services which, in turn, obligates it to receive and examine complaints or allegations that a child is delinquent for purposes of considering, among other matters, authorizing the temporary detention of juveniles or determining whether a delinquency petition should be filed.

3.     In my job as a Juvenile Probation Officer, under circumstances where I am informed of alleged delinquent or criminal behavior, I must carry out a detention risk assessment in order to determine whether or not to authorize, on behalf of the CYFD, a temporary detention or recommend a petition for delinquency charges be filed at the Children's Court attorneys'



discretion. This is usually conducted through the "on call" procedure when we receive a telephonic request from law enforcement to detain a juvenile.

4. When I receive a call from a law enforcement officer, I gather information from that officer regarding the situation. At that time, I utilize the information gathered and consult with CYFD's statewide central intake to determine how to proceed with the respect to the best interests of the juvenile and the public. In determining whether to authorize the detention of a juvenile, I utilize the criteria set forth in NMSA 1978, § 32A-2-11 (2010 Repl.Pamp.) which, in turn, requires use of the detention risk assessment instrument referenced above. In making my determination I assess whether the child (1) poses a substantial risk of harm to himself; (2) poses a substantial risk of harm to others; or (3) has demonstrated that he may leave the jurisdiction of the Court.

5. In making the decision whether to authorize detention of a child, I am obligated to follow the detention risk assessment instrument as developed by the CYFD and described in NMAC, § 8.14.1, *et seq.* Those regulations are promulgated by the CYFD pursuant to NMSA 1978 § 32A-2-4. Certain felonies, such as the charge of attempted murder, require detention under the risk assessment instrument. Under those circumstances, I authorize, on behalf of the CYFD, detention once those charges are brought to me by law enforcement.

6. Upon contact from law enforcement, I determine the name of the child, the charges brought, who the responsible adult is, among a variety of other information. The law enforcement agency investigating a given case is responsible for the methods and means of its investigation, determination of probable cause, and decision to arrest. My job, after authorizing detention, is to then conduct a preliminary inquiry pursuant to the procedures described in NMSA 1978, § 32A-2-7 (2010 Repl.Pamp.) to gather demographic information to make a social determination. Once

the preliminary inquiry is completed and I review the statement of probable cause, I make a preliminary inquiry determination, making recommendations to the Children's Court attorney whether or not to proceed with delinquency proceedings.

    7.    In the matter of Billy Jones, I was contacted by law enforcement, specifically the Espanola Police Department (EPD), on or above September 8, 2010 and was informed that the EPD was charging Billy Jones with two offenses, one each for "attempt to commit a felony" to wit: murder, and another for "aggravated assault." As part of the "On-Call Duties," a call was made to Statewide Central Intake (SCI) with the information provided by EPD for the purpose of a generating a score utilizing the Risk Assessment Instrument as per policy. SCI advised I was advised that Mr. Jones met the criteria for secure detention at which time I returned a call to Law Enforcement with the response that he was to be detained. Mr. Jones, then a juvenile, was then arrested on September 9, 2010. I conducted the preliminary inquiry on September 10, 2010, which was attended by the child (telephonically from the Detention Center), his mother and other family members. At that time, the child and the family members, including his mother, told me they wanted to "plead the Fifth." I informed them it was their right to do so. They provided me with virtually no useful information. Following the preliminary inquiry, I submitted a preliminary inquiry determination, attached hereto as Exhibit A-1, at which time, based on the circumstances above, I determined that it was in the best interests of the child and the public that a delinquency petition be filed by the Children's Court attorneys because the case involved a felony. As stated in Exhibit A-1, the "family chose not to provide any information for a social determination as they invoked their Fifth Amendment rights. Mom stated it was all a misunderstanding. Father lives [in] Georgia and both parents as well as extended family seem to be support [sic] of child." I further recommended that the "child remain in detention as he allegedly was a danger to himself,

a danger to the community and a possible flight risk." This determination was made on the basis of all information provided to me by EPD and the response from Statewide Central Intake as to meeting the criteria for detention. It is my understanding that the Children's Court attorney, as of 10/25/10, found insufficient evidence to prosecute the charges.

    Further Affiant sayeth not.

*[signature]*
MARTHA FERNANDEZ

STATE OF NEW MEXICO }
                           } ss.
COUNTY OF RIO ARRIBA }

    SUBSCRIBED AND SWORN TO before me this 4th day of March, 2014 by Martha Fernandez.

*[signature]*
NOTARY PUBLIC

My commission Expires. 12-26-17