IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

T.J., on behalf of their minor child, T.J.,

    Plaintiff,

 vs.                                                                                      No. 13-00741 RB-WPL

ESPANOLA MUNICIPAL SCHOOL
DISTRICT, JANETTE ARCHULETA and
MARTHA FERNANDEZ,

    Defendants.

Consolidated with

BILLY JONES,

    Plaintiff,

 vs.                                                                                      No. 13-1250 MV-RHS

CHILDREN, YOUTH AND FAMILIES
DEPARTMENT,

    Defendant.

**REPLY MEMORANDUM OF DEFENDANT MARTHA FERNANDEZ IN SUPPORT OF HER MOTION FOR SUMMARY JUDGMENT ON GROUNDS OF ABSOLUTE IMMUNITY OR, IN THE ALTERNATIVE, QUALIFIED IMMUNITY**

      COMES NOW, Defendant Martha Fernandez (Fernandez), by and through Hatcher & Tebo, P.A., and submits her Response Memorandum in Support of her Motion for Summary Judgment on Grounds of Absolute Immunity or, in the Alternative, Qualified Immunity (Doc. 30), to which Plaintiff filed his Response in Opposition (Doc. 36) on April 14, 2014.

I.

      Because Defendant Fernandez, through her activities as a juvenile probation officer (JPO) for the Children, Youth, and Families Department (CYFD), was acting in a quasi-prosecutorial

capacity when investigating, authorizing the detention of Plaintiff, and referring the case for formal prosecution to the Santa Fe County District Attorney, she is entitled to absolute immunity. Alternatively, because the law was not clearly established to a reasonable JPO under the circumstances presented to Fernandez by, among other sources, the Espanola Police Department (EPD), that her actions violated Plaintiff's constitutional rights, she is entitled to summary judgment on grounds of qualified immunity.

II.
REPLY TO PLAINTIFF'S RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS

In reply to Plaintiff's response to Fernandez' statement of undisputed material facts, and with respect to those which are other than admissions, Defendant Fernandez, states as follows:

UNDISPUTED MATERIAL FACTS 2:  No reply necessary.

UNDISPUTED MATERIAL FACTS 3-5:  No reply necessary except that, in his Affidavit, Billy Jones admits that the writings at issue were intended to identify people who were "bugging" him and the intent behind those drawings was to take them "to the principal's office." (Affidavit of Billy Jones, ¶9).  Further, Billy Jones took these materials to school where they were reviewed by school officials, the school psychologist, and certain personnel from the Espanola Police Department.  (Affidavit of Billy Jones).

UNDISPUTED MATERIAL FACTS 14:  Although these facts are generally denied, all are derived from the EPD statement of probable cause, provided to Defendant, Fernandez.  Thus, the facts set forth in UMF14, specifically that Plaintiff's mother acknowledged Plaintiff had violent tendencies, that Plaintiff had placed his hand around her throat, etc., gave Defendant Fernandez a reasonable belief that these facts were true.  Further, it is undisputed that when Defendant Fernandez attempted to conduct her preliminary inquiry, interviewing Plaintiff's

mother and Plaintiff, they "plead the 5th" and did not cooperate in providing any information contrary to the statement of probable cause.  (*See* Defendant's UMF 38 and Fernandez Affidavit at Doc. 30-2).

UNDISPUTED MATERIAL FACTS 15-17:  Again, although denied in the Affidavit of C.J., Plaintiff's mother, Defendant Fernandez was provided with no contrary information outside the statement of probable cause and could reasonably believe the statements contained therein, specifically that Plaintiff, when asked by EPD whether he could hurt someone or fellow students, responded by stating he did not know, or whether he could hurt himself, he responded by stating: "I don't know, sometimes I think that's the only way out," or the statement that Plaintiff's mother expressed concern for her own safety not knowing if Plaintiff would attack her.

UNDISPUTED MATERIAL FACTS 19, 20, 21:  These UMFs concern the investigation and review of a handwritten note from a student named Samantha Madrid concerning Plaintiff's threats or an email from a teacher, Ms. Litera, to Gloria Champion regarding the fact a female student was afraid of Plaintiff, are denied as inadmissible hearsay and unauthenticated documents.  However, the issue, for purposes of this motion, is not the admissibility of the hearsay or the documents but, rather, the nature of the information provided to Fernandez primarily through the statement of probable cause, as well as the fact C.J., Plaintiff's mother, in the preliminary inquiry, provided no contrary information.  In any event, the information is not hearsay because it is offered to prove the effect on the recipient of the information, specifically Fernandez. *San Juan v. IBP, Inc.,* 160 F.3d 1291, 1297 (10th Cir. 1998).

UNDISPUTED MATERIAL FACTS 29:  The fact that Lt. Lopez believed he had probable cause to arrest Plaintiff and Plaintiff's arrest was necessary to protect the public, as evidenced in his Affidavit (Doc. 30-1), is denied not because Lt. Lopez did not believe these

3

matters, but that he arguably had "no information that Plaintiff had committed a criminal act." In other words, Plaintiff appears to deny the reasonableness of Lt. Lopez' conclusions from undisputed facts, not the fact that he actually believed in his assessment of probable cause to arrest.

UNDISPUTED MATERIAL FACTS 34: Although denied in part, Plaintiff's response is, in essence, a legal argument and does not set forth any facts contrary to the statements in the Affidavit of Defendant Fernandez, (Doc. 30-2) where she attests that assuming she believes a serious, violent felony has been charged, she must approve detention of a minor. This is not denied in the lengthy argument set forth in response to UMF 34.

UNDISPUTED MATERIAL FACTS 35: In response to the statements set forth in the Affidavit of Fernandez, (Doc. 30-2, specifically ¶35), Plaintiff responds with legal argument but does not deny the actual statements that law enforcement is responsible for "the means and methods of its investigation, determination of probable cause, and decision to arrest," and that the purpose of CYFD is to conduct a preliminary inquiry and to ultimately make recommendations to the Children's Court Attorney whether or not to proceed with delinquency proceedings. All such facts identified in ¶35 of the Fernandez Affidavit are, in effect, admitted.

UNDISPUTED MATERIAL FACTS 38: In response to UMF 38, which essentially discusses the results of Defendant Fernandez' preliminary inquiry, Plaintiff refers to ¶7 of the Fernandez Affidavit (Doc. 30-2) to the extent that Plaintiff's "mom said it was all a misunderstanding and that Plaintiff had extended family support." Plaintiff's response does not, however, deny the actual statements made in UMF 38. Rather, Plaintiff suggests that Ms. Fernandez did not reasonably make her determination that Plaintiff should be detained based on undisputed facts. Nonetheless, Plaintiff has no information to oppose the fact that aside from a

statement of family support or "it was all a misunderstanding," that Defendant Fernandez received no useful information during the preliminary inquiry because Plaintiff and his mother "plead the 5th."

UNDISPUTED MATERIAL FACTS 39:  Despite Plaintiff's denial of the fact that "Lt. Lopez prepared the criminal complaint and statement of probable cause," there are, in fact, no facts offered in opposition to this UMF.  It should be deemed admitted.  Regarding Plaintiff's statement that they have "been unable to depose Christian Lopez," there has never been a request to depose Officer Lopez prior to the filing of this response.  Further, Plaintiff has filed no Affidavit required under Fed. R. Civ. Proc. 56(d) establishing a basis for asking this Court not to rule on this motion until further discovery has been undertaken.  Failure to file a Rule 56(d) Affidavit, in effect, waives any claim that the Court, pending further discovery, should delay ruling on this motion.  *See Pastore v. Bell Telephone Co. of Pennsylvania,* 24 F.3d 508, 511 (3d Cir. 1994).

With respect to all other UMFs responded to by Plaintiff, no further reply is necessary.

III.
LEGAL ARGUMENT

A. Defendant Fernandez is entitled to Absolute or Quasi-Prosecutorial Immunity even Assuming her Actions were Partly Investigative in Nature.

In his Response in Opposition to this motion, on the issue of Fernandez' claim she is entitled to absolute immunity, Plaintiff offers no additional facts which are material to a determination as a matter of law.  Rather, Plaintiff characterizes Fernandez' actions as those "not closely associated with the judicial phase of the criminal process" because Fernandez' actions "are nothing less than legal advice made during the investigative phase."  Aside from the fact Fernandez does not nor can she give legal advice because she is not a lawyer, there is nothing in

5

the record reflecting "legal advice" by Fernandez to any party.  Even assuming her actions were taken, in part, in an investigatory capacity, she is nonetheless entitled to quasi-prosecutorial or absolute immunity.

When presented with a case involving alleged delinquent or criminal behavior of minors, Fernandez, as a CYFD JPO, carries out a detention risk assessment to determine whether to authorize a temporary detention and/or recommend a petition for delinquency charges be filed with the Children's Court attorney with the Santa Fe County District Attorney's Office.  In this process, Fernandez gathers information from the appropriate law enforcement agency, here in the form of a statement of probable cause from the Espanola Police Department (EPD).  This document supported charges against Plaintiff with two offenses, one each for "attempt to commit a felony to wit:  murder", and another for "aggravated assault."  Since CYFD is not a law enforcement agency, Fernandez has no power to investigate criminal activity or file criminal charges. After assessing whether the minor poses a substantial risk of harm to himself or to others, or has demonstrated he may leave the jurisdiction of the Court, and after following the detention risk assessment instrument developed under NMAC §8.14.1 *et seq.*, she communicates to law enforcement whether they have CYFD's consent to detain the minor.  Fernandez then follows up with a preliminary inquiry determination, primarily involving an interview with the minor and family members, all of which is required before giving her ultimate recommendations to the District Attorney whether or not to prosecute delinquency proceedings.  To the extent any of this, particularly the review of the EPD statement of probable cause, carrying out the detention risk assessment, and performing her preliminary inquiry constitutes "investigation," it is clear that CYFD's statutory purpose is to gather facts, determine whether circumstances exist necessitating a temporary detention of the minor, and decide whether to refer the case to the District Attorney

with recommendations whether or not to pursue prosecution.  Clearly enunciated case law in the 10th Circuit and U.S. Supreme Court, demonstrates Fernandez' activity is fundamental to and "intimately associated" with the prosecution of minors for criminal behavior sufficient to come within absolute or quasi-prosecutorial immunity.

In *Scott v Hern,* 216 F.3d 897 (10th Cir. 2000), Plaintiff's activities as an anti-abortion activist caused him to be the subject of an involuntary commitment procedure.  He filed a §1983 case against a variety of individuals, including the County Attorney responsible for having the petition filed alleging violations of his constitutional rights.  Plaintiff's complaint alleged County Attorney Rundus wrongfully assisted the abortion clinic doctor in preparing a complaint in support of the commitment petition, failed to fully investigate the Plaintiff's mental status, relied on medical records illegally obtained in support of the petition, and moved to suppress evidence of a political conflict between the activist and the abortion clinic doctor.  The Court, in response to a Motion for Summary Judgment based, in part, on the defense of absolute immunity, dismissed the County Attorney in her individual capacity finding that her actions were "integral to the initiation of the prosecution."  *Id.* 216 F.3d at 909.  In doing so, the Court emphasized that absolute immunity, while not extending to actions that are "primarily investigative or administrative in nature," did attach "even to such administrative or investigative activities when these functions are necessary so that a prosecutor may fulfill his function as an officer of the Court."  *Id.* 216 F.3d at 908, quoting *Snell v. Tunnell*, 920 F.2d 673, 693 (10th Cir. 1990).  The Court stated: ". . . Rundus was acting pursuant to her statutory obligation to conduct the commitment proceedings once the petition for a 72-hour evaluation had been submitted . . ., and she is absolutely immune from suit concerning her actions and omissions related to the fulfillment of that obligation.  That immunized conduct includes her investigation, or lack thereof, . . . her reliance on the medical reports, . . . and

7

her Motion to Suppress." *Id.* 216 F.3d at 909.  The Court stressed that the affidavit she prepared for the abortion clinic doctor as well as her investigation into the background of the case necessary for the determination whether sufficient grounds existed to proceed with an involuntary commitment, were all integral to the initiation of the prosecution which ultimately occurred.  All such activity was immune, even that which was investigative in nature.  *Id.*

In *Pfeiffer v. Hartford Fire Ins. Co.,* 929 F.2d 1484 (10th Cir. 1991), a physician sued his medical malpractice insurer, the Colorado Attorney General, several Colorado Assistant Attorneys General as well as others in connection with disciplinary proceedings against him which resulted in a license forfeiture.  The Attorney General's office was statutorily charged with the preparation of a complaint seeking disciplinary action within the Colorado State Board of Medical Examiners (Board).  In the course of this activity, the individual state attorneys, which investigated the allegations and ultimately filed charges, were accused of violating Plaintiff's civil rights by (1) failing to investigate the charges against him "in a reasonable fashion," (2) filing and prosecuting charges that they knew or should have known were false, (3) and attempting to "coerce Plaintiff into giving up his medical practice of medicine" in return for keeping the Board proceedings against him confidential. The Court found the claims against the individual state attorneys were subject to the prosecutorial absolute immunity.  The Court stated: "There is no question in this Circuit that prosecutors are absolutely immune from liability for allegedly failing to conduct an adequate, independent investigation of matters referred to them for prosecution."  *Id.* 929 F.2d at 1490, citing *Martinez v. Winner,* 771 F.2d 424, 437 (10th Cir. 1985).  The Court found that the individual attorney's investigations into the complaints concerning the doctor necessary to determine whether or not to pursue prosecution, were absolutely immune from suit.  The Court only let stand charges of wrongful publication to the press of the disciplinary proceedings as

8

outside the prosecutorial role and, as a result, was subject only to a qualified immunity. *Id*. 929 F.2d at 1492-93.

In his response, Plaintiff characterizes Defendant Fernandez' activities as "nothing less than legal advice made during the investigative phase," in support of his argument that absolute immunity does not attach to her actions forming the basis of the Complaint. The JPO is statutorily tasked with a review of charges from law enforcement, conducting a risk assessment, completion of a preliminary inquiry on a criminal charge and, thereafter, making recommendation to the Children's Court attorney whether or not to proceed with delinquency proceedings. NMSA 1978 §32A-2-8 states that a petition alleging delinquency "shall not be filed . . . unless the Children's Court Attorney, after consulting with probation services, has determined and endorsed upon the petition that the filing of the petition is in the best interests of the public and the child." The formal filing of a petition prosecuting the minor for criminal behavior by the Children's Court Attorney cannot be initiated without the recommendation from the JPO. CYFD's involvement cannot be bypassed. (*See* Committee Commentary to Rule 10-211 NMRA which, among other matters, states that "probation services must have completed a preliminary inquiry before the petition [for prosecution] can be filed.") As such, it is integral to the criminal process of bringing delinquency proceedings against a minor. Its investigative activities are no different than those required of the individual defendants in the *Scott* and *Pfeiffer* cases which are necessary to allow the official, be it a prosecutor, a JPO or otherwise, to exercise the discretion necessary to decide whether or not to recommend prosecution. Fernandez' duties are quasi-prosecutorial in nature and subject to absolute immunity.

      B.      <u>Alternatively, Defendant Fernandez is Entitled to Summary Judgment on Grounds of Qualified Immunity</u>

In his response on the issue of whether Defendant Fernandez is entitled to qualified immunity, Plaintiff asserts that she should have known there was no objective probable cause to detain Plaintiff under the facts presented to her and that Plaintiff's "speech" was protected under the First Amendment because the contents of Plaintiff's writings did not constitute a "true threat."

Although it is unclear whether the written materials were authored by the Plaintiff at school or home, it is undisputed that they were in his backpack at the Espanola Valley High School on September 7, 2010 and reviewed by DeVanna Ortega, Assistant Principal, Danny Pacheco, School Resource Officer, Espanola Police Officer, Christian Lopez, and School Psychologist, Lloyd Vigil, in Plaintiff's presence.  It is also clear from Plaintiff's affidavit, (Doc. 36-2) that he wrote these materials for purposes of "taking it to the Principal's office."  Prior to Plaintiff's arrest and detention, it is clear that Defendant Fernandez learned, from a review of the statement of probable cause, that the "hit list" identified students who "bugged" Plaintiff, that "would pick on Billy or were bullying him," and that the "list for hell" accompanied pictures depicting tombstones with student names.  Defendant Fernandez learned that Plaintiff drew pictures "depicting dead people or a person stabbing another and [with] severe blood loss" associated with the individuals on the "list for hell" or "hit list."  She learned that Plaintiff, in response to a question from EPD as to whether he was going to hurt or injure himself, stated "he didn't think so" but "sometimes he didn't know what he was thinking in his head."  She learned that Plaintiff's mother, Cecilia Jones, mentioned that "Billy did have violent tendencies" and that two weeks prior "was said to have placed his hands around his mother's throat and then grabbed her arms."  When asked by EPD whether he thought he could hurt someone, Plaintiff stated "he did not know" and when later asked whether he would hurt himself such as kill himself, he stated: "I don't know, sometimes I think that's the only way out."  Further, Mrs. Jones "expressed that she was concerned for her safety,

not knowing if Billy would attack her." Fernandez learned, again through the statement of probable cause, that "Billy had escaped from [St. Vincent Hospital] as of Wednesday, September 8, 2010, and his whereabouts were unknown." She also read where EPD "later learned that Cecilia had gone for Billy on September 8, 2010, and had him with her at about 10:00 hours." Finally, Fernandez learned that "the fear from the staff at the high school is that Billy will act out what he has written or drawn and has the opportunity and means by which to do this," that the school was "on high alert security," and "the idea of locking down the school was also brought out." Fernandez also knew that during the course of her preliminary inquiry interview with Plaintiff's mother and Plaintiff himself, no useful information in defense of the charges was offered because they "took the 5th" and refused to cooperate in the process.

From this information and knowledge, whether or not all of it was proven fact, Fernandez acted such that she is entitled to qualified immunity because her conduct "[did] not violate clearly established statutory or constitutional rights of which [she] would have known." *See Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727 (1982).

    1.    <u>Plaintiff's "speech," consisting of the written materials and drawings at issue, is not protected under the First Amendment.</u>

The U.S. Supreme Court, in *Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 89 S. Ct. 733 (1969), while acknowledging that students do not "shed their constitutional rights to freedom of speech or expression at the school house gate," held that school officials may justify the suppression of student speech by showing "facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities." *Id.*, 393 U.S. at 514. The *Tinker* decision does not require school officials to wait until such a disruption actually occurs. *Chandler v. McMinnville School District*, 978 F.2d 524, 529 (9th Cir. 1992). In Chandler, the 9th Circuit was clear that a school official in fact has "a duty to

prevent the occurrence of such disturbances." *Id.* While the prediction of substantial disruption is unmistakably difficult, the *Tinker* decision does not require certainty in the minds of school officials that disruption will occur. Rather, "the existence of facts which might reasonably lead school officials to forecast substantial disruption," is all that is necessary to suppress speech on the school campus. *See Karp v. Becken*, 477 F.2d 171, 175 (9th Cir. 1973).

Plaintiff, in support of his claim that his First Amendment rights were violated, asserts two primary arguments. First, he claims the written materials did not constitute a "true threat," citing *U.S. v. Syring*, 522 F. Supp. 2d 125, 129 (D.D.C. 2007). Second, Plaintiff asserts there was no showing that he intended to communicate these written materials to anyone outside his home. Both conclusions are erroneous under the facts of this case.

Although Plaintiff's First Amendment rights in a school setting may be suppressed under the "substantial disruption or material interference" test first enunciated in *Tinker*, material threats of violence or those constituting "true threats" are also not protected under the First Amendment. The "true threat" basis for speech suppression was announced in *Watts v. United States*, 394 U.S. 705, 89 S. Ct. 1399 (1969), a case arising not in a school speech context but, rather, in a prosecution for threatening the life of the President of the United States. "True threats" include "those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Virginia v. Black*, 538 U.S. 343, 359, 123 S. Ct. 1536 (2003). However, in determining whether a statement amounts to an unprotected threat, there is no requirement that the speaker actually has the intent to carry out the threat, nor is there any requirement that the speaker was capable of carrying out the purported threat of violence. *Doe v. Pulaski County Special School District*, 306 F.3d 616, 624 (8th Cir. 2002), citing *Planned Parenthood of the Columbia/Willamette, Inc. v. American Coalition*

*of Life Activists,* 290 F.3d 1058, 1075 (9th Cir. 2002); *Wisniewski v. Board of Education Weedsport Central School District*, 494 F. 3d 34, 39 (2d Cir. 2007). It is true the speaker "must have intentionally or knowingly communicated the statement in question to someone before he or she may be punished or disciplined for it." *Doe*, 306 F. 3d at 624. However, in the school context, the intent to communicate element is satisfied where Plaintiff brings his materials to school under circumstances where it should have been reasonably foreseeable that such materials would be identified and eventually communicated to the alleged victims. *Mardis v. Hannibal Public School District No. 60,* 684 F. Supp. 2d 1114 (E.D. Mo. 2010), aff'd on app. 647 F. 3d 754 (8th Cir. 2011).

Speech in a school setting may be suppressed on either the *Tinker or Watts* line of cases. Specifically, if the speech constitutes a "true threat" of physical violence or where a school or other authority reasonably believes substantial disruption of or material interference with school activities is likely to occur, Plaintiff's First Amendment rights of free speech are nonexistent. There should be no serious dispute in this case whether Plaintiff's materials constituted a "true threat" or whether reasonable school authorities or others would determine there was a likelihood of "substantial disruption of or material interference with school activities." Virtually all cases involving the seizure of similar materials generally described as statements or pictures describing violent attacks on students in a school setting, have arrived at the same conclusion. *See, DJM v. Hannibal Public School District No. 60,* 647 F.3d 754 (8th Cir. 2011); *Wisniewski v. Board of Education Weedsport Central School District,* 494 F.3d 34 (2d Cir. 2007); *D.F. v. Board of Education of Syosset Central School District*, 386 F. Supp. 2d 119 (E.D. N.Y. 2005). Courts in New Mexico have adopted the *Tinker* test in allowing for suppression of speech on campus in an effort to foster an "educational atmosphere free from undue disruptions to appropriate discipline." *Bivens by and through Green v. Albuquerque Public Schools,* 899 F. Supp. 556, 559 (D.N.M.

1995). The 10th Circuit supported the suppression of a student's First Amendment right under *Tinker's* "substantial interference" standard where he was suspended for drawing a confederate flag in class. *West v. Derby Unified School District,* 206 F.3d 1358, 1365-66 (10th Cir. 2000). In the present case, Plaintiff's materials meet either the "true threat" or the "substantial interference or material disruption" tests. It cannot be reasonably disputed that the materials authored and located at school by Plaintiff "might reasonably have led school authorities to forecast substantial disruption or material interference with school activities." *Tinker* 393 U.S. at 514.

Plaintiff, nonetheless, cites to a 5th Circuit case, *Porter v. Ascension Parish School Board,* 393 F.3d 608 (5th Cir. 2004) as support for its contention that his materials did not, as a matter of law, constitute "true threats." As discussed, although the "true threat" prong is only one of two under which free speech in a school setting can be suppressed, it is important to note that the *Porter* decision did not base its holding on the actual content of the materials at issue. The Court, in fact, determined that it need not decide whether the drawing constituted a "true threat" because "Adam did not intentionally or knowingly communicate his drawing in a way sufficient to remove it from protection of the First Amendment." *Id.* 393 F.3d at 617. The Court emphasized that the sketch had been confined to the students home for more than two years, its exposure to the school was purely accidental and the result of acts of a third party, and was never intended by the student to be brought to campus. These facts are distinguishable from those before the Court in the present case. It is undisputed that the materials were authored by Plaintiff, whether on or off campus, were in fact brought to school by Plaintiff, and were written in the first place with the intent of being presented to school officials.

Consideration of the reasonableness of the suppression of speech takes on a heightened concern in a school setting when materials at issue appear to depict violence and death of students

and others. The 9th Circuit in *Wynar v. Douglas County School District,* 728 F.3d 1062 (9th Cir. 2013), reminds us that: "Given the knowledge the shootings at Columbine, Thurston and Santee High Schools, among others, have imparted about the potential for school violence . . . we must take care when evaluating a student's First Amendment right of free expression against school officials' need to provide a safe school environment not to overreact in favor of either." *Id.*, 728 F.3d at 1069-70, citing *LaVine v. Blaine School District,* 257 F.3d 981, 983 (9th Cir. 2001).

Of course, the issue presently is whether, under these facts, Plaintiff's First Amendment rights to author and bring to school or communicate the subject materials was clearly established under statutory or constitutional law such that a reasonable official, here a CYFD JPO, would have known that her actions in approving a temporary detention and recommendation of prosecution were unlawful. For several reasons, Defendant Fernandez is entitled to summary judgment on grounds of qualified immunity. First, as stated above, Plaintiff's materials either constituted a "true threat" or were such that did reasonably lead school, police, and CYFD officials to believe there would be substantial disruption of or material interference with school activities. Second, there is no clearly established law, certainly in the 10th Circuit, which would have informed Defendant Fernandez that she was violating Plaintiff's First Amendment rights. Fernandez clearly relied, and had the right to rely, on the statement of probable cause provided her by EPD. Not only did that statement express or at least imply threats to certain students on the "hit list," but reflected the fear and belief in school and police officials that there was a likelihood Plaintiff would carry out these threats. Prevailing against a qualified immunity defense by Plaintiff necessarily involves a high burden. This Court is reminded that qualified immunity applies even if Fernandez' belief as to the facts brought to her attention were mistaken in hindsight. Only if this Court finds that it was "beyond debate" that Fernandez violated Plaintiff's clearly established rights can

qualified immunity be denied. The First Amendment claim should be dismissed against Defendant Fernandez.

### 2. Fernandez Did Not Violate Plaintiff's Rights Under the 4th or 14th Amendments Under Clearly Established Law.

Plaintiff's response asserts that there was clearly no probable cause to detain Plaintiff because "there was no objectively reasonably [sic] trustworthy information that warranted the arrest of Plaintiff," and that "Defendant's fear that Plaintiff would act out the content of his drawings was based on her own subjective fear." (Doc. 36 at Pg. 21 of 23). This argument ignores the fact Fernandez is entitled to qualified immunity even if she subjectively believed, based on facts in her possession, there existed arguable probable cause to detain Plaintiff and that there was no clearly established law informing her she was violating Plaintiff's rights, whether derived from the 1st, 4th, or 14th Amendments. In fact, Plaintiff fails to address specifically Fernandez' assertion that there was no clearly established law of which she should have known pointing to the conclusion there was no probable cause to at least detain the Plaintiff for questioning.

As noted in Fernandez' Brief-in-Chief (Doc. 30), Plaintiff's allegations of wrongdoing are (1) that she failed to verify certain facts with respect to Billy Jones, such as whether he was a fugitive at large or mentally disabled teenage boy who had been released from the hospital, (2) that from the pictures he drew, it was objectively "unreasonable [his detention] as he had committed no crime in drawing pictures to reduce the stress of being bullied at school," and (3) that she lacked probable cause to arrest . . .." In his Response, Plaintiff merely cites the elements of the crimes of attempted murder and assault and argues that the facts presented to Fernandez, clearly and objectively demonstrated that the charges could not have been proved. The standard for Fernandez to establish her entitlement to qualified immunity is not that the charges brought "clearly and objectively" could be proved. Plaintiff ignores the fact the charges were generated

by the EPD and not Fernandez, and that Fernandez' role as a JPO was to approve a detention where there was a reasonable likelihood of harm to the minor or others. Plaintiff cites no authority, under the specific or similar facts presented to Fernandez in the statement of probable cause, that was clearly established that she was violating Plaintiff's constitutional rights.

In her Brief-in-Chief, Fernandez cites several cases establishing, under similar fact circumstances, probable cause to arrest as viewed by police officers in similar cases of perceived threats of violence made by students in a school setting. *See*, e.g., *Ryburn v. Huff*, 132 S. Ct. 987 (2012). Plaintiff cites no cases where qualified immunity was denied a JPO with the same or similar statutory duties to those of Fernandez, when called upon to authorize detention of a minor. Plaintiff asserts that he "made no effort to publish his personal and constitutionally protected private thoughts to any student." (Doc. 36 at pg. 21 of 23). Plaintiff, however, makes no effort to establish clear law in this or other jurisdictions, that by bringing to school these materials where it was reasonably foreseeable they may be found by third parties or eventually, the victims, Fernandez was violating Plaintiff's rights. Fernandez is not a law enforcement officer nor does she have any clearly established duty to conduct any further investigation prior to authorizing Joneses' detention. Fernandez could reasonably assume there was no clearly established law telling her that she was violating Plaintiff's rights. The Supreme Court in *Ryburn*, addressing a similar fact situation, evaluated the case from a police officer's perspective and found there "was an objectively reasonable basis for fearing that violence was imminent." *Ryburn* reminds us that the measure of the reasonableness of the officer's actions "must be judged from the perspective of a reasonable officer on the scene, rather than with a 20/20 vision of hindsight." *Ryburn*, 132 S. Ct. 987 at 992.

The Court should grant summary judgment in favor of Defendant Fernandez. Plaintiff has not carried his burden of establishing Fernandez violated a clearly established right of Plaintiff of which she reasonably should have known when ordering the detention of Plaintiff. She is entitled to an order of dismissal, with prejudice.

HATCHER & TEBO, P.A.

BY: */s/ Scott P. Hatcher*
Scott P. Hatcher, Esq.
150 Washington Avenue, Suite 204
Santa Fe, NM 87501
(505) 983-6525
Attorneys for Defendant

CERTIFICATE OF MAILING

The undersigned hereby certifies he transmitted a true and accurate copy of the foregoing via CM/ECF to:

Joseph P. Kennedy, Esq.
Shannon L. Kennedy, Esq.
The Kennedy Law Firm.
1000 Second Street, N.W.
Albuquerque, New Mexico 87102

Brian C. Garcia, Esq.
Carlos E. Sedillo, Esq.
Post Office Box 25967
Albuquerque, NM 87125
505-248-0500
Attorney for Defendants Espanola Municipal School District and Janette Archuleta

on this 2nd day of May, 2014.

*/s/ Scott P. Hatcher*_____
Scott P. Hatcher, Esq.