**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**BILLY JONES,**

      **Plaintiff,**

**vs.**                                                                  **No. 13-cv-00741 RB/WPL**

**ESPANOLA MUNICIPAL SCHOOL
DISTRICT, JANETTE ARCHULETA
and MARTHA FERNANDEZ,**

      **Defendants.**

                                     **Consolidated with**

**BILLY JONES,**

      **Plaintiff,**

**vs.**                                                                  **No. 13-cv-01250 RB/WPL**

**CHILDREN YOUTH AND FAMILIES DEPARTMENT,**

      **Defendant.**

**<u>PLAINTIFF'S RESPONSE TO DEFENDANT ESPANOLA MUNICIPAL SCHOOL
DISTRICT'S MOTION TO DISMISS CLAIMS AGAINST ESPANOLA MUNICIPAL
SCHOOL DISTRICT-AND-SUPPORTING MEMORANDUM</u>**

Generally speaking, when a court is alerted to the presence of a defect in a Complaint

under Rule 8(a)(2) of the Federal Rules of Civil Procedure, that court must determine the

propriety of allowing the plaintiff to amend his Complaint. See <u>Ashcroft v. Iqbal</u>, 556 U.S. 662,

687 (2009) ("The Court of Appeals should decide in the first instance whether to remand to the

District Court so that respondent can seek leave to amend his deficient complaint.").  In fact, "the

preferred practice is to accord a plaintiff notice and an opportunity to amend his complaint

before acting upon a motion to dismiss for failure to state a claim[.]" See <u>McKinney v. State of

Okl., Dept. of Human Services, Shawnee OK</u>, 925 F.2d 363, 365 (10th Cir. 1991); <u>see also

Lindsey v. Thomson</u>, 275 F. App'x 744, 747 (10th Cir. 2007) (unpublished) (Ordinarily, the

Court would be required to grant the Plaintiff leave to amend before dismissing this action

pursuant to Fed.R.Civ.P. 12(b)(6).") (citing (McKinney, 925 F.2d at 365); see generally Conley

v. Gibson, 355 U.S. 41, 45-46 (1957) ("In appraising the sufficiency of the complaint we follow,

of course, the accepted rule that a complaint should not be dismissed for failure to state a claim

unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim

which would entitle him to relief."); see, e.g., Dicino v. Garcia, 2014 WL 3746961, *4 (D. Colo.

July 30, 2014) (unpublished) ("Given that the Court should grant leave to amend "freely ... when

justice so requires," Fed.R.Civ.P. 15(a)(2), the Court finds that Plaintiff should here be permitted

to file his Fourth Amended Complaint with this change."). The only caveat to this standard is if

"it is 'patently obvious' that the plaintiff could not prevail on the facts alleged, and allowing him

an opportunity to amend his complaint would be futile." Campos v. Las Cruces Nursing Ctr., 828

F. Supp. 2d 1256, 1266 (D.N.M. 2011) (Browning, J.) (quoting Hall v. Bellmon, 935 F.2d 1106,

1110 (10th Cir.1991); McKinney v. Okla., Dep't of Human Servs., 925 F.2d 363, 365 (10th

Cir.1991)). This is a high standard; as articulated by Judge Browning:

> [t]he sufficiency of a complaint is a question of law, and when considering and
> addressing a rule 12(b)(6) motion, a court must accept as true all well-pled factual
> allegations in the complaint, view those allegations in the light most favorable to
> the non-moving party, and draw all reasonable inferences in the plaintiff's favor.

Campos, 828 F. Supp. 2d at 1266 (citing Smith v. United States, 561 F.3d 1090, 1097 (10th

Cir.2009); Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir.2006); Hous. Auth. of Kaw Tribe v.

City of Ponca City, 952 F.2d 1183, 1187 (10th Cir.1991)).

Plaintiff asserts that the allegations in his Complaint are not so insufficiently

unsubstantial so as to merit dismissal under Rule 12(b)(5). However, even assuming *arguendo*

that they are, Plaintiff should be granted leave to amend his Complaint in accordance with the

authorities cited and in the interests of justice. Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires.").

> I.      <u>**Application of First Amendment to the Facts Asserted**</u>

Jones' complaint should be viewed primarily through the prism of the First Amendment. Defendant wrongly alleges that Jones admitted in his complaint that he showed the drawings to other students and that he discussed the drawings with other students. Defendant argues that Jones admitted that he showed his drawings to other students. This is obviously a key fact in the context of Jones' claim. However, Jones never alleged he showed his drawings to other students. The allegations in paragraphs 28-30 of Jones' complaint relate clearly to his full disclosure of the purpose of the drawings after he was taken to Mrs. Ortega's office and searched.  He talked to Mrs. Ortega, a police officer, and a school counselor about the drawings in Mrs. Ortega's office. There is no allegation he showed the drawings to class mates.

Jones' drawings must be a true threat to lose the protection of the First Amendment.  The first question in deciding whether a writing is a true threat is discovering whether the drawings were intentionally communicated to another.  This requirement that the government show that a person intentionally communicated the alleged threatening material to another is a long established legal proposition. Defendant's attempt to misconstrue Jones' complaint shows that it acknowledges this reality. If Jones did not show his drawings to other students, his drawings are protected speech.

The government may criminalize alleged threatening speech only when it is a "true threat".  <u>Watts v. United States</u>, 394 U.S. 705, 708 (1969) (in interpreting statue outlawing threatening the President, the Supreme Court held that government did not prove a "true threat" when a protester stated that President Johnson would be the first person in his sights if he were

drafted).  The "true threat" standard requires that the accused communicate the threat in some

manner. United States v. Syring, 522 F. Supp. 2d 125, 129 (D.D.C. 2007).  A "true threat" is a

statement "where the speaker means to communicate a serious expression of an intent to commit

an act of unlawful violence to a particular individual or group of individuals."  Id. quoting,

Virginia v. Black, 538 U.S. 343, 359 (2002).

Courts determining whether communications constitute true threats have required that the

person intend to communicate the threat.  Planned Parenthood v. American Coalition of Life

Activists, 290 F.3d 1058, 1075 (9th Cir. 2002).  The Tenth Circuit, in accord with other circuits,

has also found that it is critical that an accused have intended to communicate a threat.  United

States v. Martin, 163 F.3d 1212, 1216 (10th Cir. 1998); citing, United States v. Stevenson, 126

F.3d 662, 664 (5th Cir.1997).

In the school context, Courts have adopted the reasoning of a "true threat" to determine

whether schools may punish children who engage in alleged threatening speech. The Fifth

Circuit confronted a lawsuit from parents of a child who was disciplined when his graphic

drawings were inadvertently taken to school by his younger brother.  Porter v. Ascension Parish

Sch. Bd., 393 F.3d 608, 616-17 (5th Cir. 2004).  The Fifth Circuit described the drawings as

follows:

> [The sketching] was crudely drawn, depicting the school under a state of siege by a
> gasoline tanker truck, missile launcher, helicopter, and various armed persons. The sketch
> also contained obscenities and racial epithets directed at characters in the drawing, a
> disparaging remark about EAHS principal Conrad Braud, and a brick being hurled at
> him.

Porter v. Ascension Parish Sch. Bd., 393 F.3d 608, 611 (5th Cir. 2004)

While the Fifth Circuit granted qualified immunity to the school employees for their

discipline of the student, the analysis of the Court focused on the lack of any intent to

communicate the drawing to anyone outside of his home. The Fifth Circuit held that the drawing

was not a 'true threat". The Fifth Circuit stated that generally the First Amendment protects the speech of students in their artwork. However, the government can proscribe a true threat of violence without offending the First Amendment; "to lose the protection of the First Amendment and be lawfully punished, the threat must be intentionally or knowingly *communicated* to either the object of the threat or a third person.  Importantly, whether a speaker intended to communicate a potential threat is a threshold issue, and a finding of no intent to communicate obviates the need to assess whether the speech constitutes a 'true threat.'" Id. at 616-17.  The Court then went on to find that accidental or unintentional exposure of such drawings cannot be criminalized:

> That the introduction of the drawing to EAHS was wholly accidental and unconnected with Adam's earlier display of the drawing to members of his household is undisputed. Private writings made and kept in one's home enjoy the protection of the First Amendment, as well as the Fourth.  For such writings to lose their First Amendment protection, something more than their accidental and unintentional exposure to public scrutiny must take place.

Porter v. Ascension Parish Sch. Bd., 393 F.3d 608, 617-18 (5th Cir. 2004).

In contrast, the Eight Circuit held that a student could be constitutionally punished when he allowed his friend to communicate the contents of a threatening letter to the subject of the threats.  Doe v. Pulaski County Special Sch. Dist., 306 F.3d 616, 624-25 (8th Cir. 2002).  The Doe Court adopted the reasoning of other circuits, including the Tenth Circuit, and held that the threat must be communicated: "the speaker must have intentionally or knowingly communicated the statement in question to someone before he or she may be punished or disciplined for it." Id. The requirement is satisfied if the speaker communicates the statement to the object of the purported threat *or* to a third party.  Id., citing, United States v. Crews, 781 F.2d 826, 831–32 (10th Cir.1986) (affirming conviction under 18 U.S.C. § 871 where a defendant made a statement to a third party that threatened to kill the President); Hawaii v. Chung, 75 Haw. 398,

862 P.2d 1063, 1071–73 (1993) (recognizing that a defendant's statements to other teachers that he would kill the principal were true threats entitled to no First Amendment protection). In <u>Doe</u>, the Eighth Circuit found that the student intentionally communicated his threats in a letter when he allowed another student to read the letter.  The student knew that there was a good possibility that the contents of the letter would be reported to the student threatened.  <u>Id</u>.  The student disciplined had also discussed the contents of the letter with the person threatened. <u>Id</u>.

 The drawings are protected First Amendment speech.  Our Supreme Court recently re-stated the breadth of First Amendment protected activity when it struck down a ban of violent videos to minors.  The Supreme Court wrote that exposing children to violence is nothing new:

> California's argument would fare better if there were a longstanding tradition in this country of specially restricting children's access to depictions of violence, but there is none. Certainly the *books* we give children to read—or read to them when they are younger—contain no shortage of gore. Grimm's Fairy Tales, for example, are grim indeed. As her just deserts for trying to poison Snow White, the wicked queen is made to dance in red hot slippers "till she fell dead on the floor, a sad example of envy and jealousy." The Complete Brothers Grimm Fairy Tales 198 (2006 ed.). Cinderella's evil stepsisters have their eyes pecked out by doves. *Id.,* at 95. And Hansel and Gretel (children!) kill their captor by baking her in an oven. *Id.,* at 54.
> High-school reading lists are full of similar fare. Homer's Odysseus blinds Polyphemus the Cyclops by grinding out his eye with a heated stake. The Odyssey of Homer, Book IX, p. 125 (S. Butcher & A. Lang transls. 1909) ("Even so did we seize the fiery-pointed brand and whirled it round in his eye, and the blood flowed about the heated bar. And the breath of the flame singed his eyelids and brows all about, as the ball of the eye burnt away, and the roots thereof crackled in the flame"). In the Inferno, Dante and Virgil watch corrupt politicians struggle to stay submerged beneath a lake of boiling pitch, lest they be skewered by devils above the surface. Canto XXI, pp. 187–189 (A. Mandelbaum transl. Bantam Classic ed.1982). And Golding's Lord of the Flies recounts how a schoolboy called Piggy is savagely murdered *by other children* while marooned on an island. W. Golding, Lord of the Flies 208–209 (1997 ed.).

<u>Brown v. Entm't Merchants Ass'n</u>, 131 S. Ct. 2729, 2736-37, 180 L. Ed. 2d 708 (2011).

 In addressing Justice Alito's concern that the video games are truly graphic, The Supreme Court wrote:

Justice ALITO has done considerable independent research to identify, see *post,* at 2749
– 2750, nn. 13–18, video games in which "the violence is astounding," *post,* at 2749.
"Victims are dismembered, decapitated, disemboweled, set on fire, and chopped into
little pieces.... Blood gushes, splatters, and pools." *Ibid.* Justice ALITO recounts all these
disgusting video games in order to disgust us—but disgust is not a valid basis for
restricting expression. And the same is true of Justice ALITO's description, *post,* at 2749
– 2750, of those video games he has discovered that have a racial or ethnic motive for
their violence—" 'ethnic cleansing' [of] ... African Americans, Latinos, or Jews." To
what end does he relate this? Does it somehow increase the "aggressiveness" that
California wishes to suppress? Who knows? But it does arouse the reader's ire, and the
reader's desire to put an end to this horrible message. Thus, ironically, Justice ALITO's
argument highlights the precise danger posed by the California Act: that the *ideas*
expressed by speech—whether it be violence, or gore, or racism—and not its objective
effects, may be the real reason for governmental proscription.

<u>Brown v. Entm't Merchants Ass'n</u>, 131 S. Ct. 2729, 2738, 180 L. Ed. 2d 708 (2011).

At the pleadings stage, the absence of any allegation that Jones' showed his drawings to
anyone voluntarily permits Jones' First Amendment claim to proceed.  The drawings receive the
protection of the First Amendment, unless they constitute a "true threat".

## II.    <u>Municipal Liability</u>

Jones alleges that the Espanola school district acted as a municipal body against him. In
fact, on November 17, 2010, the Board of Education for the Espanola Public Schools sent
counsel a letter stating that Jones was expelled from school.  [Exhibit 1].  Defendant states that
"there is no allegation in the Amended Complaint that Plaintiff sought to have the school board
review the expulsion".  Jones did have the Board review the expulsion and the Board did affirm
the expulsion.  Defendant's attempt to ask this Court to dismiss a complaint for failure to allege a
fact it knows existed is cynical at best.

A single act of a governing board binds the municipality.

The "official policy" requirement was intended to distinguish acts of the *municipality*
from acts of *employees* of the municipality, and thereby make clear that municipal
liability is limited to action for which the municipality is actually responsible. . . .
No one has ever doubted, for instance, that a municipality may be liable under § 1983 for
a single decision by its properly constituted legislative body—whether or not that body
had taken similar action in the past or intended to do so in the future—because even a

single decision by such a body unquestionably constitutes an act of official government policy.

Pembaur v. City of Cincinnati, 475 U.S. 469, 479-81, 106 S. Ct. 1292, 1298-99, 89 L. Ed. 2d 452 (1986).

The Tenth Circuit has made clear also that a local municipality's governing board's

decisions bind the local municipality:

It is undisputed before us that the Board *was* the final policymaker on personnel matters for the District. It is also undisputed that Ms. Simmons's employment was terminated pursuant to the Board's own actions. The decision to fire Ms. Simmons is thus no less chargeable as an official act of the District than one taken pursuant to the District's written RIF policy. Accordingly, we cannot agree with the district court's judgment that the District is immune from potential Section 1983 liability on *Monell* grounds.

Simmons v. Uintah Health Care Special Dist., 506 F.3d 1281, 1286 (10th Cir. 2007).

The Board clearly affirmed Jones' expulsion.  Jones alleged in paragraphs 60 and 61 of

his amended complaint that the school district expelled him.  The record supports Jones'

allegations that the governing board of the school district expelled Jones.

### III.    Equal Protection

Jones does not oppose dismissal of his equal protection claim.

### IV.    Arbitrary Denial of Education

Plaintiff alleges that he was denied a right to education, a property interest, for an

arbitrary reason.  In the context of a public education,

"The Due Process Clause not only provides a procedural safeguard against deprivations of life, liberty, and property but also protects substantive aspects of those interests from unconstitutional restrictions by government." *Harris v. Blake,* 798 F.2d 419, 424 (10th Cir.1986). Absent certain factors not present here, we will uphold a school's decision to suspend a student in the face of a substantive due process challenge if the decision is not arbitrary, lacking a rational basis, or shocking to the conscience of federal.

Butler v. Rio Rancho Pub. Sch. Bd. of Educ., 341 F.3d 1197, 1200-01 (10th Cir. 2003)(citations omitted).

Jones alleges that the Board expelled him from school for private expression of his First

Amendment rights and that this activity was recommended treatment from a licensed therapist.

Jones actually was evaluated by mental health professionals. [paragraphs 36-39]. Plaintiff alleges

that the Board's decision to deny him a public education was arbitrary. Based on Plaintiff's

complaint, he brought drawings to school; the drawings were in his backpack; the drawings were

removed from his backpack by law enforcement when he was in an administrator's office; Jones

received a mental health evaluation; Jones was given a clean bill of health; and Jones was seeing

a therapist for his PTSD. The denial of public education to a young man who did not disrupt

school in any manner is arbitrary.

### V.   **Qualified Disability**

Jones concedes he failed to plead the major life activities, which his PTSD impaired.

Jones requests leave to amend to more clearly plead what major life activities were affected by

his PTSD. Jones concedes that the Tenth Circuit takes an individualized approach to disability

and that such an allegation should be in the complaint:

> The ADA does not define the term "major life activity." That term has been construed to mean a "basic activity that the average person in the general population can perform with little or no difficulty." *See Pack v. Kmart Corp.,* 166 F.3d 1300, 1305 (10th Cir.1999). Major life activities include such functions as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, sleeping, sitting, standing, lifting, reaching, and working. *See Poindexter v. Atchison, Topeka & Santa Fe Ry. Co.,* 168 F.3d 1228, 1231-32 (10th Cir.1999). "The Supreme Court in *Bragdon* made clear that the court, in making determinations of law and formulating jury instructions, is to analyze only the major life activity asserted by the plaintiff." *Id.* (discussing *Bragdon,* 524 U.S. at 637-39, 118 S.Ct. at 2205).

> Doyal v. Oklahoma Heart, Inc., 213 F.3d 492, 495-96 (10th Cir. 2000)

### VI.   **Eleventh Amendment Immunity**

Defendant cites law discussing a State's Eleventh Amendment immunity. The school

district is not an arm of the state. Duke v. Grady Municipal Schools, 127 F. 3d 972, 978 (10th Cir.

1997) (deciding New Mexico School Districts are not arms of the state).

WHEREFORE, Plaintiff requests that the Court deny Defendant's Motion to Dismiss and grant him leave to amend his claim under the Americans with Disabilities Act to allow him to allege the effect of his PTSD on major life functions.

Respectfully Submitted,

**KENNEDY KENNEDY & IVES, LLC**

*/s/ Joseph P. Kennedy*
Joseph P. Kennedy
Shannon L. Kennedy
Laura S. Ives
Theresa V. Hacsi
Attorneys for Plaintiff
1000 Second Street NW
Albuquerque, New Mexico 87102
(505) 244-1400 Fax (505) 244-1406

I hereby certify that I served the above pleading on all parties by electronically filing it with the CM/ECF system this 20th day of August, 2014.

*/s/ Joseph P. Kennedy*
Joseph P. Kennedy