IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

BILLY JONES,

     Plaintiff,

vs.                                                                                No. 13-cv-00741 RB/WPL

ESPANOLA MUNICIPAL SCHOOL DISTRICT,
and SUPERINTENDENT JANETTE ARCHULETA,

     Defendants.

## PLAINTIFF'S RESPONSE TO MOTION FOR SUMMARY JUDGMENT ON QUALIFIED IMMUNITY BY DEFENDANT JANETTE ARCHULETA

Plaintiff, Billy Jones, hereby Responds to Defendant Archuleta's Motion for Summary Judgment on Qualified Immunity [Doc. 84]. Plaintiff's Second Amended Complaint [Doc. 68] alleges Defendant Archuleta violated Billy's First Amendment right by punishing him for protected speech and his Fourteenth Amendment right by arbitrarily expelling him from school. Defendant is not entitled to qualified immunity for either claim because the law was clear that the First Amendment protected Billy's drawings and, a reasonable juror could find that Archuleta's expulsion of Billy from school was arbitrary and capricious as the punishment far exceeded any legitimate school interest in discipline.

## I.    Legal Standard for Summary Judgment.

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Where different ultimate inferences may properly be drawn, the case is not one for summary judgment." Webb v. Allstate Life Ins. Co., 536 F.2d 336, 339 (10th Cir. 1976).

## II.    The Qualified Immunity Standard.

In evaluating a motion for summary judgment based on qualified immunity the Court must take the facts "in the light most favorable to the party asserting the injury."  e.g., Cavanaugh v.

Woods Cross City, 625 F.3d 661, 662 (10th Cir. 2010).  When a defendant asserts qualified immunity

as a summary judgment, the burden shifts to the plaintiff to meet two tests. First, the plaintiff must

show that, on the facts alleged, the defendants violated constitutional or statutory rights. Martinez v.

Carr, 479 F.3d 1292, 1295 (10th Cir. 2007). Second, the plaintiff must demonstrate the infringed

right was clearly established at the time of the defendants' allegedly unlawful conduct such that a

reasonable government official would have known that his challenged conduct was illegal. Id.

> Courts have discretion to decide the order in which to engage these two prongs. But
> under either prong, courts may not resolve genuine disputes of fact in favor of the
> party seeking summary judgment. This is not a rule specific to qualified immunity; it
> is simply an application of the more general rule that a judge's function at summary
> judgment is not 'to weigh the evidence and determine the truth of the matter but to
> determine whether there is a genuine issue for trial.' Summary judgment is appropriate
> only if 'the movant shows that there is no genuine issue as to any material fact and the
> movant is entitled to judgment as a matter of law.' Fed. Rule Civ. Proc. 56(a).

Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014) (quotation omitted).  "A reasonably competent public

official should know the law governing his conduct." Seamons v. Snow, 206 F.3d 1021, 1030 (10th

Cir. 2000) (quotation omitted).

    "To be clearly established, the contours of the right must be sufficiently clear that a

reasonable official would understand that what he is doing violates that right." Albright v.

Rodriguez, 51 F.3d 1531, 1534-5 (10th Cir. 1995) (citation omitted) "Although the very action in

question does not have to have previously been held unlawful, 'in the light of pre-existing law the

unlawfulness must be apparent.'" Id.  By definition this determination does not require that there be

a previous case opinion dealing with the precise issue and facts alleged.  Cortez v. McCauley, 478

F.3d 1108, 1119 (10th Cir. 2007)[1].  Rather, "[t]he relevant, dispositive inquiry in determining whether

a right is clearly established is whether it would be clear to a reasonable officer that his conduct was

---

[1] Where, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." (citation omitted).

unlawful in the situation he confronted." <u>Holland ex rel. Overdorff v. Harrington</u>, 268 F.3d 1179, 1186 (10th Cir. 2001) (quotation omitted).  Finally, "qualified immunity does not depend on the officer's subjective, good faith belief that he was not violating clearly established federal law, but instead the defense now hinges on whether that belief was reasonable." <u>Keylon</u> at 1218 (citation omitted).

The Supreme Court recently emphasized the necessity for courts to make all reasonable inferences in favor of the non-moving party when determining the clearly established prong of the qualified immunity analysis.

> Our qualified-immunity cases illustrate the importance of drawing inferences in favor of the nonmovant, even when, as here, a court decides only the clearly-established prong of the standard. In cases alleging unreasonable searches or seizures, we have instructed that courts should define the 'clearly established' right at issue on the basis of the specific context of the case. Accordingly, courts must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions.

<u>Tolan</u> at 1866 (quotations omitted).  In summary, the Defendants must show that no genuine issue of material facts exists regarding either prong of the qualified immunity analysis.

Notably, Defendants' ignore the role of the jury in their presentation of the qualified immunity standard.  <u>Estate of Booker v. Gomez</u>, 745 F.3d 405 (10th Cir. 2014) states that:

> [w]hen the defendant has moved for summary judgment based on qualified immunity, we still view the facts in the light most favorable to the non-moving party and resolve all factual disputes and reasonable inferences in its favor…. [A]t summary judgment, we must grant qualified immunity unless the plaintiff can show (1) ***a reasonable jury*** could find facts supporting a violation of a constitutional right, which (2) was clearly established at the time of the defendant's conduct.

<u>Id.</u> at 411 (emphasis added) (citation omitted).  When facts are disputed the determination of whether Archuleta's decision to expel Billy was arbitrary should be a jury determination.

## III.   <u>Response to Statement of Undisputed Material Facts.</u>

As a preliminary matter, Plaintiff denies Defendant's asserted facts, ¶¶ 1-11.  Defendant's asserted facts are not supported by admissible evidence. Fed. R. Civ. P. 56(c).  Defendant's asserted

facts are solely supported by Defendant's Exhibit A, the Affidavit of Dr. Fidel Trujillo.  Dr. Trujillo was the hearing officer for Billy's disciplinary hearing and he has no personal knowledge regarding the events at issue in Plaintiff's Complaint.  See Defendant Espanola's Responses to Plaintiff's Request for Admissions, at No. 11, attached hereto as **Exhibit 1**.  Rather, Dr. Trujillo "was briefed of the incident[.]" **Id**. Dr. Trujillo may not testify to evidence without personal knowledge.  Fed. R. Evid. 602.  Dr. Trujillo's testimony and the attachments to his affidavit are also inadmissible hearsay. Fed. R. Evid. 801 and 802. In further response to Defendants' asserted facts, Plaintiff states:

1. Plaintiff denies Defendant's asserted facts at ¶¶ 1-2, 5 and 9.  Billy did not create or bring a "hit list" to school; Bill never wrote "hit list" on any of his drawings.  **Exhibit 1**, at No. 5. Rather, Billy had a list of students who "bugged him" which contained students who had bullied Billy. See Affidavit of Billy Jones, at ¶¶ 8-13, attached hereto as **Exhibit 2.** He created the "bully list" at the prompting of his therapist and mother for submission to the principal in an attempt to help prevent further bullying of Billy or of any other students.  **Id**.  Defendant's characterization of the list as a "hit list" is inaccurate, inflammatory and impermissible because it is unsupported and seeks for the Court to draw an adverse inference against Plaintiff.  See generally Webb v. Allstate Life Ins. Co., 536 F.2d 336, 339 (10th Cir. 1976).  In addition, Defendant has no evidence that any student *saw* the list.

2. Plaintiff denies Defendant's asserted facts at ¶¶ 5-9 and contends those facts are immaterial. Defendant has not offered any admissible evidence supporting her allegations.  However, Billy's alleged feelings as well as his relationship with his mother is immaterial to whether: 1) Defendant violated Billy's First Amendment Right by punishing him for possessing the list and drawings in question, and 2) Defendant violated Billy's Fourteenth Amendment Right by arbitrarily expelling him for possessing the list and drawings in question.

3.   Plaintiff denies Defendant's asserted fact at ¶10 as immaterial.  There is no allegation that the alleged observed behavior is linked to violence in any manner. Thus, the inclusion of the alleged behavior simply exposes Defendants as untrained arbiters of psychological behavior and its import in deciding whether a person is homicidal. Deposition of Trujillo, at 30:25-31:4, attached hereto as **Exhibit 5**.

4.   Plaintiff admits Defendant's asserted facts, at ¶¶ 12-14.

IV.   **Additional Material Facts.**

1.   Billy enjoyed watching horror movies like Friday the 13th and Nightmare on Elm Street and aspired to produce movies himself one day. **Exhibit 2,** at ¶ 15-19.

2.   Billy created the drawings as a story board for a future movie.  **Id.**

3.   Billy's drawings were private and he carried them in his backpack. **Exhibit 2,** at ¶ 15-19.

4.   On September 7, 2010, Billy was called into the office by security guards.  **Id**, at ¶ 20.

5.   Officers searched Billy's backpack and discovered his drawings inside.  **Id**.

6.   The documents found included:

i.    An untitled list which identified the first names of nine individuals and the full name of one individual.  See Documents Removed from Billy's backpack, at **Exhibit 3**, at 1.

ii.   A handwritten note that states "I believe...:

- that BS should be one of BR 31 Flavors. 2 scoops.
- anyone who wants to wear a thong should have to go through an Application process
- Ignorance of the law is no excusse [sic] I'm quoting a NYC Judge on this one
- how old are you? old enough to play this thing.  Whens your b-day? (11/6) no what year? Every year you ass.
- you show me a 3 yo Running around in the flea market, drinking cc out of a Bottle, and I'll show you a future Nascar fan.
- You gatta [sic] rent the truck to get the incurance [sic] money to make your truck payment[.]
- I'll have a scotch oh, I allready [sic] have one go right ahead.

**Exhibit 3**, at 2.

iii.     A crude drawing of a man scowling with his hands in the air.  The man is in a room with a door and a picture of two stick figures; one figure has an arrow.  There are dark spots on the floor and wall which may be blood. No individual is identified in this drawing. **Exhibit 3**, at 3.

iv.     A crude drawing of a man with a shovel who appears to be hitting a bag hanging from a tree.  The bag appears to be dripping blood. No individual from the "bully list" is identified in this drawing. **Exhibit 3**, at 4

v.     Another handwritten list. The list is titled "List for Hell" and lists "1. Pink Whore 2. Special Blonde 3. fat ASS 3. Chrisd 4. Chriss 5. Austin" **Exhibit 3**, at 5.

vi.     Handwritten notes from Biology.  **Exhibit 3**, at 6.

vii.     Another handwritten list.  This list is titled "List" and lists "1. Nathan 2. Austin 3. Dustin 4. Rosa 5. Megan 6. Jaymes 7. Kayla" **Exhibit 3**, at 7.

viii.     A piece of paper that states "1. Austin Coks" in handwriting. **Exhibit 3**, at 8.

ix.     A handwritten note that states "I Believe (Noise) that wasn't me!" **Exhibit 3**, at 9.

x.     A crude drawing of a man with a knife decapitating another man outside of a camping tent.  Someone appears to be in a sleeping bag inside of the tent.  No individual from the "bully list" is identified in this drawing. **Exhibit 3**, at 10.

xi.     A crude drawing of individuals holding on to straps hanging from the ceiling of a room. There is a bear trap on the floor as well as a mallet.  A crudely drawn man is laying on the floor in a puddle of blood.  There are two decapitated heads on a shelf.  No individual from the "bully list" is identified in this drawing. **Exhibit 3**, at 11.

xii.     A handwritten drawing of four tomb stones.  The Tombs stones each state "RIP."  One tomb stone states, "Jolene Benson." Another states, "fat ASS." Another states, "Austin

C." The fourth states, "Christ D. Trujillo Mexican Hitler."  The drawing states "Rest in

Peace to Hell."

**Exhibit 3**, at 12.

xiii.   A handwritten note that states:

- the way to a man's heart is not through a man's stomac [sic] it's a little further
south
- the only thing worse than having Diaria [sic] is having it quietly in a public
restRoom.
- Cripple Stool 1. they always keep clean 2. lot of room/legs 3. rails for power
[illegible].
- Cripple Stool is the catolack [sic] at a [illegible] stool
- Guns don't kill people, Husbands that come early do.
- If you can't say anything nice about someone, you're probably talking about
Hillary Clinton

**Exhibit 3**, at 13.

xiv.   A handwritten note that states:

- The phrase time in a bottle refurse [sic] to the amount of beer you can drink
before last call
- if you let someone cut you off, and Dont give you the little waive, Perfectly
leagle [sic], get up [illegible]. Get them loose, and put them into the wall Amen.
- if life gives you lemons you make lemonade and try to find someone whose
life is vodka, and have a party
- I believe that's it GNS

**Exhibit 3**, at 14

7.   There is no evidence that any student saw Billy's drawings or lists. Deposition of Archuleta,

at 15:2-17:5, attached hereto as **Exhibit 4;**[2] see also **Exhibit 2**.

---

[2] Defendant relies on her Exhibit A-4 as evidence that a student saw Billy's list.  Defendant's Exhibit A-4 is an email
regarding Billy and is inadmissible hearsay.  Fed. R. Evid. 801 and 802. The email contains the double (or possible triple)
hearsay statements of unidentified students. Defendant's Exhibit A-4.  However, Defendant's Exhibit A-4 does not
allege that any student saw Billy's drawings or that he threatened any student in any way nor does the email provide any
temporal scope of the events alleged therein.  Rather, Exhibit A-4 states that the student believed Billy had a list with her
name on it.  Exhibit A-4 also asserts that two students (possibly different students) have stated they are afraid of Billy.
Neither of these assertions support an inference that Billy threatened a student or that any student saw the list or his
drawings.  Defendant Archuleta acknowledges that there is no indication on the email that the student saw the list or
whether Billy published the list or if the student happened to see the list; there is no indication of why the student
believes her allegations to be true.  **Exhibit 4**, at 14:1-12. Defendant Archuleta never spoke to the student referenced in

8.   The drawings were art and a source of expression for Billy.  **Exhibit 2**.

9.   Defendant Archuleta expelled Billy because of the drawings found inside his backpack.  See Defendant's Asserted Undisputed Facts, at ¶¶ 12-14.

10.   When deciding to expel Billy, Defendant Archuleta's real concern "was that there were drawings, not how [Billy] communicated them to other students. [Her] concern was that there were very explicit drawings depicting violence and specifically violence toward students at our school." **Exhibit 4**, at 54:23-55:8.  However, none of the people depicted in the story boards was a student. **Exhibit 3**.  The "bully list" and the story boards were separate.  In fact, the only character with a name on the story boards was "angel," who is not named on the "bully list." **Exhibit 3**.

11.   Prior to Billy's disciplinary Hearing, Dr. Fidel Trujillo attended a debriefing with school officials.  **Exhibit 5**, at 21:10-22:19.

12.   Dr. Trujillo knew about the background of the incident through the debriefing prior to becoming a hearing officer.  **Id**; see also September 9, 2010 memorandum (bates number 000094-00095), attached hereto as **Exhibit 7**

13.   Prior to Billy's disciplinary hearing, Dr. Trujillo told Defendant Archuleta that a student "allegedly escaped from the hospital.  The cause for concern was that the student had made threats, created a list of names of students he intended to hurt, and drawn some graphic pictures in a notebook that had been confiscated by site administrators." **Exhibit 7**.

14.   Despite Dr. Trujillo's "debriefing" and unsubstantiated belief that *the student* escaped from the mental hospital, Dr. Trujillo volunteered to be Billy's hearing officer.  **Exhibit 7**, see also **Exhibit 5**, at 21:10-22:19.

---

Defendant's Exhibit A-4 to ascertain how she knew about the list; nor does Defendant Archuleta know whether any individual ever spoke to the unidentified student.  **Exhibit 4**, at 20:3-12.

15. Defendant Archuleta selected Dr. Trujillo to be Billy's hearing officer. **Exhibit 4**, at 32:18-21.

16. A person is disqualified to be a hearing officer if they are directly involved in the investigation and overseeing the discipline of the school site. **Exhibit 4**, at 40:4-8.

17. District policy directed that a hearing officer "shall have no direct connection to the act or acts, person alleged to have perpetrated the acts, nor be an administrator of the school in which the acts took place." **Exhibit 4**, at 44:5-45:6.

18. Defendant Archuleta appointed Dr. Trujillo as the hearing officer even though he had a preconceived understanding of the incident. **Exhibit 4**, at 41:19-43:21.

19. After the hearing, Dr. Trujillo recommended Billy's expulsion because of the graphic nature of the drawings **Exhibit 5**, at 27:10-13.

20. Dr. Trujillo has a very limited understanding of the connection, if any, psychologically, between a person drawing out a violent activity and actually committing violent acts. **Exhibit 5**, at 30:25-31:4.

21. Billy's hearing was the first time Dr. Trujillo served as a hearing officer and Dr. Trujillo had no background in recommending discipline to students as a hearing officer prior to Billy. **Exhibit 5**, at 24:15-23.

22. Dr. Trujillo did not consider how similar student acts had been treated in the past or how other students were punished prior to recommending Billy's expulsion. **Exhibit 5**, at 23:23-24:3.

23. Defendant Archuleta issued a letter of expulsion to Billy's parents based on Dr. Trujillo's recommendation. **Exhibit 4**, at 47:14-19.

24. The district prohibits: criminal or delinquent acts; gang related activity; sexual harassment; disruptive conduct; refusal to identify self; and refusal to cooperate with school personnel. See

District's Policy on Student Discipline (000104-000108), attached hereto as **Exhibit 8**. Billy did not

engage in prohibitive conduct when he created his story boards and the "bully list."

25. The district may discipline a student if the student:

- Engages in conduct that is disorderly, i.e. intentionally causing public inconvenience, annoyance, or alarm, or recklessly creating a risk thereof, by:
  - Fighting or engaging in violent behavior.
  - Making unreasonable noise.
  - Using abusive or obscene language or gestures.
  - Obstructing vehicular or pedestrian traffic.
  - Creating a hazardous or physically offensive condition by any act that serves no legitimate purpose.
- Engages in conduct that is insubordinate, i.e. failing to comply with the lawful directions of a teacher, school administrator, or other school employee in charge of the student.
- Endangers the safety, morals, health, or welfare of others by any act, including but not limited to:
  - Selling, distributing, using, or possessing alcohol, drugs, or other controlled substances or drug paraphernalia.
  - Selling, distributing, using, or possessing weapons, fireworks, or other dangerous instruments or contraband.
  - Selling, using, or possessing obscene materials.[3]
  - Using profane, vulgar, or abusive language (including ethnic slurs).
  - Gambling.
  - Hazing.
  - Engaging in lewd behavior.
- Engages in any form of the following forms of academic misconduct:
  - Lateness for, missing, or leaving school or class without permission or excuse.
  - Cheating …
  - Plagiarism.
- Engages in conduct violative of the Board's rules and regulations for the maintenance of public order on school property.
- Has a record of excessive absenteeism.
- Is believed to have or actually has committed a crime.

**Exhibit 8.** Billy did not engage in any conduct that could be disciplined by possessing his story

boards and the "bully list."

---

[3] Obscene material is sexual in nature. See <u>Brown v. Entm't Merchants Ass'n</u>, 564 U.S. 786, 792–93, 131 S. Ct. 2729, 2734, 180 L. Ed. 2d 708 (2011) ("Our cases have been clear that the obscenity exception to the First Amendment … only [covers] depictions of 'sexual conduct[.]'")

26. The district's disciplinary policy explicitly lists what conduct may result in long-term suspension, expulsion, or placement in an alternative educational setting.  **Exhibit 8**, at 000105.  The acts punishable by expulsion are:

    i.    Possession of alcoholic beverages, narcotics or controlled substances;
    ii.    Serious, continued, documented misbehavior/*habitually disruptive;
    iii.    Serious vandalism of District property or any personal property on District property over the total value of one thousand dollars ($1,000) including the cost of repair or replacement;
    iv.    Serious, continued fighting or threatening bodily injury to others; and
    v.    Open and persistent defiance of District personnel, volunteers or visitors.

**Exhibit 8**, at 000105-000106. Per district policy, "No child is to be declared to be an 'habitually disruptive student' prior to the development of a remedial discipline plan for such child in accordance with the conduct and discipline code of the District." **Exhibit 8**, at 000106.  Billy was not an 'habitually disruptive student' and he did not engage in any conduct that warranted expulsion by possessing his story boards and the "bully list."

27. The District engaged in progressive discipline that ranged from verbal warnings, written warnings, parent notification, probation, detention, corporal punishment, suspension from school privileges, in school suspension, suspension, and expulsion.  **Exhibit 8**, at 000106-000107. Despite no prior discipline, the school expelled Billy.

28. From 2010 to 2011, Espanola School District documented approximately 1,058 student code violations which were disciplined.   Affidavit of Theresa Hacsi, attached hereto as **Exhibit 6**.

29. Of the 1,058 incidents, 252 incidents involved a student who: threatened violence, committed actual violence, committed a battery (including inappropriate touching), participated in gang activity, or possessed and/or used a weapon on campus.  **Exhibit 6**.

30. Of the 252 incidents, 7 incidents did not identify the number of days a student was suspended and merely stated "OSS;" there are 245 incidents which identify the number of days a student was suspended.   **Exhibit 6**.

11

31. Of these 245 incidents, the average number of days a student was suspended was 3.36 days. **Exhibit 6**.

32. Of the 245 incidents, 6 incidents contained a comment that an expulsion hearing would be recommended and/or requested, which include:

i. A 10th grade student who was suspended for aggravated fighting. The student refused to go to class and assaulted the security officer. The student was suspended for 10 days. **Exhibit 6**.

ii. A 9th grade student who was suspended for possession of a weapon (knife), cutting, and tobacco possession. This student was suspended for 10 days. **Exhibit 6**.

iii. A 10th grade student who was suspended for aggravated fighting, assaulting a security guard and hitting a police officer. The student was suspended for 10 days. **Exhibit 6**.

iv. A 9th grade student who was suspended for possessing a knife on campus. He was observed playing with the knife at school. The student was suspended for 9.5 days. **Exhibit 6**.

v. An 11th grade student who was suspended for possessing stolen property, possessing a dangerous object (lighter), and aggravated battery. The student tried to burn another student with the lighter. This student was suspended for 6.5 days. **Exhibit 6**.

vi. A 9th grade student who was suspended for gang related activity. The student was following another student into the restroom because he refused to shake his hand a particular way. The student was suspended for five days and was referred to teen court. **Exhibit 6**.

33. Of the 245, there are 18 incidents when the school district did not suspend the student and performed in-school suspension or other alternative discipline. These incidents include:

i.   An 11th grade student who was given 2 days of in school suspension for throwing rocks and hurting someone. **Exhibit 6**.

ii.   A 6th grade student who had a parent teacher conference for assault/battery. Specifically, the student had been pushing and punching, and continued to be disruptive in class.  He lunged at a student teacher and pushed a teacher. **Exhibit 6**.

iii.   A 10th grade student was given 5 days in school suspension for fighting, intimidating and bullying a student. He threw the first punch. **Exhibit 6**.

iv.   A 12th grade student who was given 1 day in-school suspension for fighting, pushing and threatening another student. **Exhibit 6**.

34.  Other significant incidents include:

i.   A 10th grade student who was suspended for 6 days for disrespect, insubordination, misbehavior, disruptive behavior, rudeness, throwing dangerous objects (rocks, snow balls), profanity. **Exhibit 6**.

ii.   An 11th grade student who was suspended for 1 day for aggravated assault, and threatening a security officer. **Exhibit 6**.

iii.    A 9th grade student who was suspended for 10 days for threatening a security guard and causing a safety concern after the student was caught with paraphernalia.  **Exhibit 6**.

iv.   A 9th grade student who was suspended for 3 days for threatening a student and threatening to kick another student's "ass."  The school had text messages documenting the threat. **Exhibit 6**.

v.   A 9th grade student who was suspended for 3 days for threatening a student.  The student threatened to beat up another student over a pair of stolen sunglasses.  The school had text messages documenting the threat. **Exhibit 6**.

vi.   A 9th grade student who was suspended for 2.5 days and referred to teen court for threatening another student. **Exhibit 6**.

vii.   A 9th grade student who was suspended for 2 days for violence generally.  The student was threatening, intimidating, and teasing. The student was accused of throwing his girlfriend up against a wall, and had been intimidating and controlling their relationship. **Exhibit 6**.

viii.   An 8th grade student who was suspended for 2 days for fighting and assault toward an adult. The student threatened another student and used profanity. **Exhibit 6**.

ix.   An 8th grade student who was suspended for 2 days for threatening a security guard and making obscene gestures. **Exhibit 6**.

x.   A 9th grade student who was suspended for 10 days for fighting and aggravated assault. **Exhibit 6**.

xi.   A 9th grade student (who has been disciplined 11 times) was suspended for 10 days for aggravated assault, teasing, truancy, and rudeness. **Exhibit 6**.

xii.   A 9th grade student who was suspended for 5 days for fighting and aggravated assault. **Exhibit 6**.

xiii.   An 11th grade student who was suspended for 3 days for aggravated assault.  The student threw an object at a female student hitting her on the right shoulder causing a laceration. **Exhibit 6**.

35.  There are several instances of assaults, batteries and fighting where students have been suspended from 1 to 8 days. **Exhibit 6**.

36.   Defendant has provided no evidence that any student, other than Billy Jones, was expelled from 2010 to 2011 for threats of violence. **Exhibit 6**.

37. Based on the material provided by Defendants, all punishments from 2010 to 2011 that involve actual violence, and not just threats of violence, were less severe than Billy Jones's punishment. **Exhibit 6**.

38. Based on the material provided by Defendants, all punishments from 2010 to 2011 that involve threats of violence were less severe than Billy Jones's punishment. **Exhibit 6**.

39. Based on the material provided by Defendants, all punishments from 2010 to 2011 that involved a student who disrupted the school were less severe than Billy Jones's punishment. **Exhibit 6**.

V.   **ARGUMENTS AND AUTHORITIES**

A)   **Defendant Archuleta is not entitled to Qualified Immunity on Billy's First Amendment Claim:**

"It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 506 (1969). "[S]chool officials cannot suppress expressions of feelings with which they do not wish to contend." Id. at 511 (quotation omitted). Pursuant to Tinker, Billy undisputedly retained First Amendment protections from school punishment. The First Amendment protects Billy's speech since there is no evidence that Billy "materially disrupt[ed] classwork or involve[ed] substantial disorder or invasion of the rights of others[.]" Id. at 513; see also Seamons v. Snow, 84 F.3d 1226, 1237 (10th Cir. 1996).

i.  **The First Amendment Protects Billy's drawings as artistic expression.**

Billy had a first amendment right to possess his drawings because the drawings are protected First Amendment speech. "[T]he First Amendment has 'permitted restrictions upon the content of speech in a few limited areas,' and has never 'include[d] a freedom to disregard these traditional limitations.'" United States v. Stevens, 559 U.S. 460, 468–69, 130 S. Ct. 1577, 1584, 176 L. Ed. 2d 435 (2010) (quoting, R.A.V. v. City of St. Paul, Minn., 505 U.S. 377, 382-383, 112 S. Ct. 2538, 120 L.

Ed. 2d 305 (1992).  Types of speech which may be restricted are historical and traditional categories

of speech which are well established in our precedent and include:  obscenity, defamation, fraud,

incitement, and speech integral to criminal conduct.  See id, at 1584 (citing Roth v. United States,

354 U.S. 476, 483, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957); Beauharnais v. Illinois, 343 U.S. 250, 254–

255, 72 S.Ct. 725, 96 L.Ed. 919 (1952); Virginia Bd. of Pharmacy v. Virginia Citizens Consumer

Council, Inc., 425 U.S. 748, 771, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976); Brandenburg v. Ohio, 395

U.S. 444, 447–449, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (per curiam ); and Giboney v. Empire

Storage & Ice Co., 336 U.S. 490, 498, 69 S.Ct. 684, 93 L.Ed. 834 (1949)).  These categories "are

'well-defined and narrowly limited classes of speech, the prevention and punishment of which have

never been thought to raise any Constitutional problem.'"  Id, at 1584 (quoting Chaplinsky v. New

Hampshire, 315 U.S. 568, 571–572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942)).  "[N]ew categories of

unprotected speech may not be added to the list by a legislature that concludes certain speech is too

harmful to be tolerated." Brown v. Entm't Merchants Ass'n, 564 U.S. 786, 791, 131 S. Ct. 2729,

2734, 180 L. Ed. 2d 708 (2011); see also United States v. Stevens, 559 U.S. 460, 472, 130 S. Ct. 1577,

1586, 176 L. Ed. 2d 435 (2010) (finding, prior cases do not establish "a freewheeling authority to

declare new categories of speech outside the scope of the First Amendment.").

     Depictions of violence are not within the well-defined and narrowly limited classes of speech

which may be restricted by the government.  See generally Winters v. New York, 333 U.S. 507, 520,

68 S. Ct. 665, 672, 92 L. Ed. 840 (1948); see also Brown v. Entm't Merchants Ass'n, 564 U.S. 786,

793, 131 S. Ct. 2729, 2735, 180 L. Ed. 2d 708 (2011) (holding, "Our opinion in Winters … made

clear that violence is not part of the obscenity that the Constitution permits to be regulated.").

Brown reaffirmed the holding in Winters that prohibits the government's restriction of violent

material when it struck down a ban relating to the sale of violent video games to minors. The

Supreme Court explicitly noted that exposing children to violence is nothing new:

California's argument would fare better if there were a longstanding tradition in this country of specially restricting children's access to depictions of violence, but there is none. Certainly the *books* we give children to read—or read to them when they are younger—contain no shortage of gore. Grimm's Fairy Tales, for example, are grim indeed. As her just deserts for trying to poison Snow White, the wicked queen is made to dance in red hot slippers "till she fell dead on the floor, a sad example of envy and jealousy." The Complete Brothers Grimm Fairy Tales 198 (2006 ed.). Cinderella's evil stepsisters have their eyes pecked out by doves. Id., at 95. And Hansel and Gretel (children!) kill their captor by baking her in an oven. Id., at 54.

High-school reading lists are full of similar fare. Homer's Odysseus blinds Polyphemus the Cyclops by grinding out his eye with a heated stake. The Odyssey of Homer, Book IX, p. 125 (S. Butcher & A. Lang transls. 1909) ("Even so did we seize the fiery-pointed brand and whirled it round in his eye, and the blood flowed about the heated bar. And the breath of the flame singed his eyelids and brows all about, as the ball of the eye burnt away, and the roots thereof crackled in the flame"). In the Inferno, Dante and Virgil watch corrupt politicians struggle to stay submerged beneath a lake of boiling pitch, lest they be skewered by devils above the surface. Canto XXI, pp. 187–189 (A. Mandelbaum transl. Bantam Classic ed. 1982). And Golding's Lord of the Flies recounts how a schoolboy called Piggy is savagely murdered *by other children* while marooned on an island. W. Golding, Lord of the Flies 208–209 (1997 ed.).

Brown v. Entm't Merchants Ass'n, 131 S. Ct. 2729, 2736-37, 180 L. Ed. 2d 708 (2011). Furthermore, in addressing Justice Alito's concern that the video games are truly graphic, the Supreme Court wrote:

Justice Alito has done considerable independent research to identify … video games in which "the violence is astounding[.]" "Victims are dismembered, decapitated, disemboweled, set on fire, and chopped into little pieces.... Blood gushes, splatters, and pools." Justice Alito recounts all these disgusting video games in order to disgust us—but **disgust is not a valid basis for restricting expression**. And the same is true of Justice ALITO's description … of those video games he has discovered that have a racial or ethnic motive for their violence—" 'ethnic cleansing' [of] ... African Americans, Latinos, or Jews." To what end does he relate this? Does it somehow increase the "aggressiveness" that California wishes to suppress? Who knows? But it does arouse the reader's ire, and the reader's desire to put an end to this horrible message. Thus, ironically, Justice Alito's argument highlights the precise danger posed by the California Act: that the *ideas* expressed by speech—whether it be violence, or gore, or racism—and not its objective effects, may be the real reason for governmental proscription.

Id, at 2738 (emphasis added).

Billy's drawings alone, no matter how graphic or unseemly, are protected speech and those drawings remain protected unless the speech is a "true threat." Watts v. United States, 394 U.S. 705,

708 (1969) (in interpreting statute outlawing threatening the President, the Supreme Court held that government did not prove a "true threat" when a protester stated that President Johnson would be the first person in his sights if he were drafted). The "true threat" standard requires that the accused communicate the threat in some manner. United States v. Syring, 522 F. Supp. 2d 125, 129 (D.D.C. 2007). A "true threat" is a statement "where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." Id. (quoting Virginia v. Black, 538 U.S. 343, 359 (2002)). Courts determining whether communications constitute true threats have required that the person intend to communicate the threat. Planned Parenthood v. American Coalition of Life Activists, 290 F.3d 1058, 1075 (9th Cir. 2002).

The Tenth Circuit, in accord with other circuits, has also found that it is critical that an accused have intended to communicate a threat. United States v. Martin, 163 F.3d 1212, 1216 (10th Cir. 1998) (citing United States v. Stevenson, 126 F.3d 662, 664 (5th Cir. 1997)). Defendant Archuleta has not provided any admissible evidence that Billy intended to communicate an intent to commit an unlawful act of violence against a person.  There is no evidence that Billy published his drawings to any student or teacher.  The drawings were first discovered in Billy's backpack after an officer seized and searched Billy's belongings.  Without evidence that Billy intended to threaten someone, his speech cannot be construed as a "true threat."

In a similar case, the Fifth Circuit confronted a lawsuit from parents of a child (Adam) who was disciplined when his graphic drawings were inadvertently taken to school by his younger brother. Porter v. Ascension Parish Sch. Bd., 393 F.3d 608, 616-17 (5th Cir. 2004). The Fifth Circuit described the drawings as follows:

> [The sketching] was crudely drawn, depicting the school under a state of siege by a gasoline tanker truck, missile launcher, helicopter, and various armed persons. The sketch also contained obscenities and racial epithets directed at characters in the

18

drawing, a disparaging remark about EAHS principal Conrad Braud, and a brick being hurled at him.

Porter v. Ascension Parish Sch. Bd., 393 F.3d 608, 611 (5th Cir. 2004).

School officials confronted Adam about the drawings and subsequently found a box cutter with a one-half inch exposed blade, a note pad with gang symbols, and fake identification in Adam's possession on school property. Porter v. Ascension Par. Sch. Bd., 393 F.3d 608, 612 (5th Cir. 2004). Adam was subsequently expelled. Id.

The Court found that, "[i]t is indisputable that expressions such as Adam's drawing, provided that they do not constitute a true threat, are entitled to First Amendment protection." Porter v. Ascension Par. Sch. Bd., 393 F.3d 608, 618 (5th Cir. 2004). When assessing whether speech is a "true threat", the Fifth Circuit focused on the author's intent to communicate the alleged threat; "to lose the protection of the First Amendment and be lawfully punished, the threat must be intentionally or knowingly *communicated* to either the object of the threat or a third person. Importantly, whether a speaker intended to communicate a potential threat is a threshold issue, and a finding of no intent to communicate obviates the need to assess whether the speech constitutes a 'true threat.'" Id. at 616-17. The Court then went on to find that accidental or unintentional exposure of such drawings cannot be criminalized:

> That the introduction of the drawing to EAHS was wholly accidental and unconnected with Adam's earlier display of the drawing to members of his household is undisputed. Private writings made and kept in one's home enjoy the protection of the First Amendment, as well as the Fourth. For such writings to lose their First Amendment protection, something more than their accidental and unintentional exposure to public scrutiny must take place.

Id. at 617-18 (5th Cir. 2004).

No evidence supports an inference, let alone an undisputed fact, that Billy intended to communicate a threat to any student. Indeed, Billy did not intend his drawings to be threatening

19

and did not intend to publish his drawings to any student; accidental disclosure is insufficient to render speech a "true threat." As such, the First Amendment protects Billy's speech.

Although the Fifth Circuit found the drawings enjoyed First Amendment protection, the Court granted qualified immunity to the school administrators because of perceived ambiguity regarding the application of the <u>Tinker</u> test to the facts found in <u>Porter</u>. <u>Id.</u>, at 619 (finding, "Although reaching differing conclusions as to the legality of restrictions placed upon the speech in question, these cases consistently approach off-campus speech brought on-campus as subject to regulation under <u>Tinker's</u> 'material and substantial' disruption test.")

The Fifth Circuit decided <u>Porter</u> in 2004, well before Billy's expulsion. The concerns expressed in <u>Porter</u> are not applicable to this case because the law is clearly established in the Tenth Circuit that Billy's drawings must be a true threat and the facts of Billy's case applicable to the "material and substantial" disruption test are distinguishable from the facts in <u>Porter</u>.

### ii. Billy's drawings did not materially and substantially interfere with the operation of the school.

It is clearly established that "school authorities may not penalize students for their speech when that speech is non-disruptive, non-obscene[4], and not school-sponsored." <u>Seamons v. Snow</u>, 206 F.3d 1021, 1030 (10th Cir. 2000). A 'precise factual correlation between the then-existing law and the case at-hand is not required.'" <u>Id</u>, at 1030 (10th Cir. 2000) (quoting <u>Patrick v. Miller</u>, 953 F.2d 1240, 1249 (10th Cir. 1992). Under the <u>Tinker</u> test, Billy's protected speech may not be punished unless it "materially disrupts classwork or involves substantial disorder or invasion of the rights of others[.]" <u>Tinker v. Des Moines Indep. Cmty. Sch. Dist.</u>, 393 U.S. 503, 513, 89 S. Ct. 733, 740, 21 L. Ed. 2d 731 (1969). Under Tenth Circuit precedent, restricting a student's free speech requires a reasonable belief that the particular form of expression created or will create a substantial

---

[4] "Our cases have been clear that the obscenity exception to the First Amendment … only [covers] depictions of 'sexual conduct[.]'" <u>Brown v. Entm't Merchants Ass'n</u>, 564 U.S. 786, 792–93, 131 S. Ct. 2729, 2734, 180 L. Ed. 2d 708 (2011).

disruption to school discipline.  See <u>Taylor v. Roswell Indep. Sch. Dist.</u>, 713 F.3d 25, 35 (10th Cir.

2013).[5] Here, there is no evidence that Billy's drawings created or were likely to create substantial

disorder. Indeed, Archuleta testified she expelled Billy for the content of his drawings and not for

threatening students. **Exhibit 4**, at 54:23-55:8.  Billy did not do anything but possess the drawings

and the "bully list" in his backpack.  Billy did not publish his drawings or the "bully list" to any

students and Defendant has provided no admissible evidence to the contrary.

The drawings were first seen when officers searched Billy's backpack.  Because Billy never

published his drawings at school he cannot be found to have materially disrupted classwork or of

creating substantial disorder. One of the lists found in Billy's backpack (which list is unclear) was the

only document other students may have known about as referenced in Defendant's Exhibit A-4.

Although Defendant's Exhibit A-4 is inadmissible, the contents of Exhibit A-4 do not establish that

Billy created substantial disorder.

The evidentiary value of Exhibit A-4, if any, is limited to an assertion that a student believed

Billy wrote her name on a list.  How the student gained her belief is unknown and there is no reason

to believe the student perceived anything to make her believe the list signified anything specific, let

alone a "hit list." Exhibit A-4 could refer to, among many things, an invitation list to a party, a list of

students in Billy's class, a list of students who are "noisy and laughing," as teacher Josefina Litera

believed, or a list of students who bullied Billy. Defendant's Exhibit A-4.  Defendant Archuleta

never spoke to nor had anyone else speak to the student about the alleged list. Billy had multiple

"bully lists" in his backpack and Defendant has no evidence which list Exhibit A-4 refers to.  It is

unreasonable for Defendant Archuleta to label Billy's only alleged behavior, creating a list, as

---

[5] Where school's prohibition of the mass distribution of hundreds or thousands of three-dimensional rubber fetus dolls
to public high school students during the school day was constitutional under <u>Tinker</u> when the school offered alternative
forums for the students to express their religious views and the dolls could: be easily torn apart, bounce against walls,
stick to ceilings, and served as tempting projectiles and toilet-clogging devices.

materially disruptive to classwork or causing substantial disorder because creating a list is an

innocuous behavior. Defendant Archuleta should have known that Billy's speech was protected

speech and that his conduct did not cause nor was reasonably likely to cause a disturbance at school.

In fact, Archuleta admitted that she expelled Billy for the content of his drawings, and not because

he communicated them to other students. **Exhibit 4**, at 54:23-55:8.

Billy's behavior did not cause substantial disorder as opposed to the plaintiff's conduct in

Porter.  In Porter, the drawings were actually published to the students and caused a disruption.

Porter v. Ascension Par. Sch. Bd., 393 F.3d 608, 611 (5th Cir. 2004) (where, "While flipping through

the pages of the pad, the student came upon the two-year old drawing by Adam and showed it to

the bus driver, Diane McCauley, exclaiming, "Miss Diane, look, they're going to blow up EAHS.")

Neither Billy's drawings nor his list were ever published to students nor was there a resulting

disruption.[6]

 Defendant's reliance on West v. Derby Unified Sch. Dist. No. 260, 206 F.3d 1358, 1366

(10th Cir. 2000) is misplaced.  In West, the student drew a confederate flag viewable to his class

despite the school's anti-harassment policy. Although the Court found the student's speech

protected, the Court found that the school had provided sufficient evidence that it reasonably

believed the confederate flag was likely to lead to a school disturbance.  Specifically,

> [s]chool officials in Derby had evidence from which they could reasonably conclude
> that possession and display of Confederate flag images, when unconnected with any
> legitimate educational purpose, would likely lead to a material and substantial
> disruption of school discipline. The district experienced a series of racial incidents or
> confrontations in 1995, some of which were related to the Confederate flag. The
> incidents included hostile confrontations between a group of white and black students
> at school and at least one fight at a high school football game. The Racial Harassment
> policy enacted in response to this situation was clearly something more than a mere
> desire to avoid the discomfort and unpleasantness that always accompany an
> unpopular viewpoint. The history of racial tension in the district made administrators'
> and parents' concerns about future substantial disruptions from possession of

---

[6]In addition, the Court may have found the defendant's decision to expel Adam objectively reasonable under the totality
of the circumstances because Adam brought a weapon, gang symbols and fraudulent identification onto campus.

> Confederate flag symbols at school reasonable. The fact that a full-fledged brawl had
> not yet broken out over the Confederate flag does not mean that the district was
> required to sit and wait for one.... In this case, the district had a reasonable basis for
> forecasting disruption from display of such items at school, and its prohibition was
> therefore permissible.... The fact that T.W.'s conduct may not have resulted in an actual
> disruption of the classroom ... does not mean that the school had no authority to act.
> The district had the power to act to prevent problems before they occurred; it was not
> limited to prohibiting and punishing conduct only after it caused a disturbance.

Id, at 1366–67 (quotation omitted). Unlike the school officials in West, here Defendant Archuleta

has no evidence that the possession of Billy's drawings or the list was likely to cause a disturbance.

In West, the district had also adopted a specific policy to confront a specific threat.  In addition, the

student in West was only suspended for three days; not expelled like Billy.  The difference in

discipline is not objectively reasonable.

   D.F. ex rel. Finkle v. Bd. of Educ. of Syosset Cent. Sch. Dist., 386 F. Supp. 2d 119, 123

(E.D.N.Y. 2005), aff'd sub nom. D.F. v. Bd. of Educ. of Syosset Cent. Sch. Dist., 180 F. App'x 232

(2d Cir. 2006) is also distinguishable.  In D.F., the student read a fictional story to his classmates that

depicted them being brutally murdered and participating in sexual acts with one another.  Obviously,

the student's conduct is distinguishable from Billy's because Billy did not stand in front of his class

to describe his drawings to them.

**B)    Defendant Archuleta is not entitled to Qualified Immunity on Billy's
    Fourteenth Amendment Claim:**

   The Due Process Clause of the Fourteenth Amendment states, "[n]o State shall … deprive

any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV. § 1.

"The Fourteenth Amendment proscribes a state from, among other things, depriving a party of

'property without due process of law.'" Hyde Park Co. v. Santa Fe City Council, 226 F.3d 1207,

1210 (10th Cir. 2000) (quoting U.S. Const. amend. XIV, § 1).  "Since the time of [the Supreme

Court of the United States'] early explanations of due process, we have understood the core of the

concept to be protection against arbitrary action[.]" Cty. of Sacramento v. Lewis, 523 U.S. 833, 845,

118 S. Ct. 1708, 1716, 140 L. Ed. 2d 1043 (1998). The government's deprivation of property may implicate either a *procedural* due process claim or a *substantive* due process claim. "Procedural due process ensures the state will not deprive a party of property without engaging fair procedures to reach a decision, while substantive due process ensures the state will not deprive a party of property for an arbitrary reason regardless of the procedures used to reach that decision." Hyde Park Co. v. Santa Fe City Council, 226 F.3d 1207, 1210 (10th Cir. 2000).

"'[T]o prevail on either a procedural or substantive due process claim, a plaintiff must first establish that a defendant's actions deprived plaintiff of a protectible property interest.'" Teigen v. Renfrow, 511 F.3d 1072, 1078 (10th Cir. 2007) (quoting Hyde Park Co. v. Santa Fe City Council, 226 F.3d 1207, 1210 (10th Cir. 2000)). "A protected interest in liberty or property may have its source in either federal or state law." Elliott v. Martinez, 675 F.3d 1241, 1244 (10th Cir. 2012) (relying on Ky. Dep't of Corr. v. Thompson, 490 U.S. 454, 460 (1989)). "Protected liberty interests may arise from two sources – the Due Process Clause itself and the laws of the States." Bd. of Regents of State of Coll. v. Roth, 408 U.S. 564, 577.  New Mexico law provides Billy a property interest in a free public education. N.M. Const. art. XII, § 1 and N.M.S.A. 1978 § 22-1-4; see also Scanlon v. Las Cruces Pub. Sch., 2007-NMCA-150, 143 N.M. 48, 53, 172 P.3d 185, 190 (finding, "[t]here is no dispute that [a student] has a property interest in continuing his public education[.]");see also Goss v. Lopez, 419 U.S. 565, 574, 95 S. Ct. 729, 736, 42 L. Ed. 2d 725 (1975) ("[T]he State is constrained to recognize a student's legitimate entitlement to a public education as a property right which is protected by the Due Process Clause and which may not be taken away for misconduct without adherence to the minimum procedures required by that Clause."). Billy is entitled to due process protections because he had a property interest in his free public education.

"'In order to present a claim of denial of 'substantive' due process by a discharge for arbitrary or capricious reasons, a liberty or property interest must be present to which the protection

24

of due process can attach.'" <u>Curtis v. Oklahoma City Pub. Sch. Bd. of Educ.</u>, 147 F.3d 1200, 1215 (10th Cir. 1998) (quoting <u>Brenna v. Southern Colo. State College</u>, 589 F.2d 475, 476 (10th Cir. 1978). Here, Billy asserts that Defendant Archuleta deprived him of procedural and *substantive* due process because Defendant appointed a hearing officer who was involved in the initial response to the discovery of Billy's drawings and her conduct in expelling Billy was arbitrary and Billy had a property interest in his education.   "Assuming a protected property interest, ' '[s]ubstantive' due process requires only that termination of that interest not be arbitrary, capricious, or without a rational basis.'" <u>Curtis v. Oklahoma City Pub. Sch. Bd. of Educ.</u>, 147 F.3d 1200, 1215 (10th Cir. 1998) (quoting <u>Brenna v. Southern Colo. State College</u>, 589 F.2d 475, 477 (10th Cir. 1978); <u>see</u> <u>also</u> <u>Lujan v. City of Santa Fe</u>, 89 F. Supp. 3d 1109, 1143 (D.N.M.), <u>reconsideration denied,</u> 122 F. Supp. 3d 1215 (D.N.M. 2015) (quoting <u>Rio Grande Chapter of the Sierra Club v. N.M. Mining Comm'n</u>, 2003–NMSC–005, ¶ 17, 133 N.M. 97, 61 P.3d 806, 813 (2003); quoting also <u>Perkins v. Dep't of</u> <u>Human Servs</u>*.,* 1987–NMCA–148, ¶ 20, 106 N.M. 651, 748 P.2d 24, 28 (stating, "The Supreme Court of New Mexico has explained that a hearing officer's decision is arbitrary and capricious only 'if it is unreasonable or without a rational basis.' 'Where there is room for two opinions, the action is not arbitrary or capricious if exercised honestly and upon due consideration, even though another conclusion might have been reached.'") The Court "will uphold a school's decision to suspend a student in the face of a substantive due process challenge if the decision is not arbitrary, lacking a rational basis, *or* shocking to the conscience of federal judges." <u>Butler v. Rio Rancho Pub. Sch. Bd.</u> <u>of Educ.</u>, 341 F.3d 1197, 1200–01 (10th Cir. 2003) (emphasis added).  Here, Billy seeks relief for Archuleta's arbitrary decision to expel him.[7]

---

[7] Defendant cites <u>Seamons</u>, for the "shocks the conscience" standard.  However, the Court did not apply the "shocks the conscience standard" to the district's arbitrary decision to punish plaintiff.  Rather, the plaintiff in <u>Seamons</u> sought substantive due process relief for "the School District's failure to protect Brian from the taunting and hostility of his fellow students." <u>Seamons v. Snow</u>, 84 F.3d 1226, 1235 (10th Cir. 1996).  This is a danger creation theory which "must

Taking all factual inferences in favor of Billy and comparing discipline handed out for actual acts of violence, a reasonable jury could find that Archuleta's expulsion was arbitrary. Billy did not threaten any student, nor did he pose a threat to any student. In fact, Billy did not engage in any behavior that justified discipline per Espanola School District Policy, let alone expulsion. **Exhibit 8**.

An expulsion serves as a complete deprivation of education.  The district has a history of minimally punishing students who cause actual harm to other students or overtly threaten other students and staff.   For instance, students who brought actual weapons, not merely drawings, to school were only suspended.  Students who made actual threats of violence (not protected by the First Amendment) were also only suspended; one such student was not even suspended and received one day of in-school suspension; two other students were only suspended for 3 days when their communicated threats were undisputed and documented in text messages. Archuleta was unable to connect the drawings to an actual threat.

Other students who actually caused physical harm to their classmates did not get expelled like Billy.  One student was only suspended for 6.5 days after trying to burn a classmate with a lighter; another student was suspended for 3 days after lacerating another student's shoulder; another student was suspended for 2 days after throwing his girlfriend against a wall; and another student hurt someone else with a rock, but only received a 2-day suspension.  In contrast, Billy hurt no one and threatened no one.  Billy's alleged threat was as imaginary as the content of his drawings. Yet, the district punished Billy more severely than students who actually hurt or threatened to hurt others.

Defendant contends that Billy's drawings are "on par" with the drawing in <u>West</u> in response to Billy's due process claim.  Defendant's Motion, at 11.  Yet, in <u>West</u> the district only suspended the

---

be predicated on 'reckless or intentional injury-causing state action which shocks the conscience.'" <u>Seamons v. Snow</u>, 84 F.3d 1226, 1236 (10th Cir. 1996) (citations omitted).

child for three (3) days and did not expel the student. Archuleta's reliance on <u>West</u> only reinforces her arbitrariness; Archuleta expelled a student when "on par" conduct only warranted a three-day suspension.  Indeed, the three-day suspension in <u>West</u> is "on par" with Espanola School District's average suspension for violent conduct of 3.36 days.  **Exhibit 6**. Plaintiff contends that a jury should decide whether Archuleta's expulsion was arbitrary.

<u>**CONCLUSION**</u>

Billy's drawings are protected speech which may not be punished.  Billy did not create a disturbance at school because he never published his drawings to any student.  Indeed, Defendant's punishment was not only constitutionally prohibited by the First Amendment, but was so arbitrary in its severity that it is actionable under the Fourteenth Amendment as well.

WHEREFORE, for the foregoing reasons, Plaintiff respectfully petitions this Court to deny Defendant's Motion in its entirety.

Respectfully Submitted:

**KENNEDY KENNEDY & IVES**

<u>**/s/ Joseph P. Kennedy**</u>
Joseph P. Kennedy
Theresa V. Hacsi
*Attorneys for Plaintiff*
1000 2nd Street NW
Albuquerque, New Mexico 87102
(505) 244-1400 / Fax (505) 244-1406


I hereby certify that a true and correct copy of the foregoing was served upon opposing counsel on the day of its filing via the CM/ECF filing system.


<u>**/s/ Joseph P. Kennedy**</u>
Joseph P. Kennedy